LANDMARK STRUCTURES, INC., Plaintiff and Counterdefendant-Appellant, v. F.E. HOLMES AND SONS CONSTRUCTION COMPANY, INC., Defendant and Counterplaintiff-Appellee (American Insurance Company, Defendant-Appellee).

Fifth District   No. 5—88—0787

Opinion filed April 6, 1990.

Ronald E. Fuhr, of Parker, Siemer, Austin, Resch & Resch, of Effingham, for appellant.

G. Patrick Murphy, of Winters, Brewster, Murphy, Crosby & Patchett, of Marion, for appellees.

PRESIDING JUSTICE LEWIS delivered the opinion of the court:

The plaintiff, Landmark Structures, Inc. (hereafter referred to as Landmark), brought an action to recover an alleged balance of $154,072.35 due on a contract between it and the defendant, F.E. Holmes and Son Construction Company, Inc. (hereafter referred to as Holmes). Under the contract, entered into on October 12, 1982, the plaintiff was to provide prefabricated wall panels or units to the defendant for use in the construction of three multifamily apartment complexes located in Anna, Vienna, and Metropolis, Illinois. Plaintiff sued the defendant American Insurance Company as surety. As one of its affirmative defenses, Holmes alleged that certain of the panels were not merchantable, in violation of section 2—314 of the Uniform Commercial Code (Ill. Rev. Stat. 1981, ch. 26, par. 2—314), and that Holmes' damages incurred on account of Landmark's breach exceeded the amount of Landmark's claim. The defendant Holmes counter-claimed against Landmark, alleging that on June 28, 1982, Holmes had entered into a contract with the Illinois Housing Development Authority for the construction of what is known as Country Village I in Anna, Country Village II in Vienna, and Country Village III in Metropolis. Holmes alleged in the counterclaim *inter alia* that the goods specified in the agreement between it and Landmark had been non-conforming "in that the siding was not affixed to the wallboard in accordance with specifications and the vapor barrier was not properly affixed in accordance with specifications." Holmes alleged further that the goods specified in the agreement between it and Landmark were not of even kind and quality and were not fit for the ordinary purposes for which goods are sold in that the siding buckled from the wallboard from which it was attached in violation of section 2—314 of the Uniform Commercial Code. Holmes had, it alleged, substituted

goods for the nonconforming ones provided by Landmark at an expense to Holmes of $143,211.63.

Following a bench trial, conducted on October 24 and 25, 1988, the trial court entered judgment in favor of Holmes and against Landmark on Landmark's complaint and on Holmes' counterclaim. The amount of the judgment on the counterclaim was $53,421.81. Upon the trial court's denial of Landmark's post-trial motion, this appeal followed in which six issues are presented for our review: (1) whether the contract between Landmark and Holmes contained a valid disclaimer of warranties pursuant to section 2—316 of the Uniform Commercial Code (Ill. Rev. Stat. 1981, ch. 26, par. 2—316); (2) whether the contract between Landmark and Holmes contained a valid limitation of remedies pursuant to section 2—719 of the Uniform Commercial Code (Ill. Rev. Stat. 1981, ch. 26, par. 2—719); (3) whether the damages awarded to Holmes on its counterclaim were supported by the evidence; (4) whether Holmes' exhibits Nos. 11, 12, 13 and 14, consisting of summaries of back charges, should have been admitted into evidence; (5) whether Holmes met "its burden of proof to show the absence of an intervening cause of the buckling of the siding"; and (6) whether one who provides materials specifically designated in a construction contract is liable if those materials are defective or are later shown to be unsuitable.

Lewis Martin, who in October of 1982 had been Landmark's president, testified on behalf of Landmark concerning Landmark's exhibit No. 1, which the witness described as an "order form" whose purpose was "to tell us what to build and what options to supply." This exhibit consists of several pages, the first several of which are on buff-colored paper. The first page of this exhibit, unlike the remaining pages, is printed on both sides. The front of the first page bears Landmark's logo and the heading "ORDER FORM MULTI-FAMILY SPECIAL BUILDINGS." The total amount of the contract, set forth on the front of this page, is $786,262.60. The signature "R.L. Holmes" appears at the bottom of the front of this page on the line above the words, in bold print in black ink, "SIGNATURE OF AUTHORIZED PERSON," which is immediately above the words in bold print in brown ink, "PER 'CONDITION OF SALE' REVERSE SIDE." On the reverse side are 11 paragraphs, number 10 of which is designated "Warranty and Disclaimer." In subparagraph (b) of this paragraph, the following appears in capital letters:

"MANUFACTURER ASSUMES NO OBLIGATION BEYOND THAT SET FORTH IN THIS AGREEMENT, AND CONTRACTOR ACCEPTS THE FOREGOING IN PLACE OF IN-

CIDENTAL OR CONSEQUENTIAL DAMAGES THAT MAY BE INCURRED BY THE CONTRACTOR. THE FOREGOING SHALL BE CONTRACTOR'S SOLE REMEDY AND SHALL BE IN LIEU OF ALL WARRANTIES, WHETHER EXPRESSED OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A SPECIFIC PURPOSE OR LOCATION."

As a result of the agreement, the witness stated, Landmark delivered panels and materials to Holmes. On cross-examination the witness stated that Jimmy Maxwell was the salesperson who had taken this exhibit to be executed by Holmes. The witness was not present when the exhibit was signed. Jimmy Maxwell did not testify.

Landmark called as an adverse witness Richard Lynn Holmes, who is the defendant's president. He testified that the signature on Landmark's exhibit No. 1 was his. On cross-examination he testified that at the same time he signed Landmark's exhibit No. 1 in his office he also signed Holmes' exhibit No. 2 in the presence of the salesperson Jimmy Maxwell. No one else from Landmark was present at the time. He described the front of the first page of Landmark's exhibit No. 1 and the front of the first page of Holmes' exhibit No. 2 as "identical except for color." Appearing on Holmes' exhibit No. 2, which is white, is the witness' original signature, "R.L. Holmes," in ink that has been smudged since the time of signing. Unlike the back of Landmark's exhibit No. 1, the back of Holmes' exhibit No. 2 is blank; nor do the contents of the back of Landmark's exhibit No. 1 appear anywhere else in Holmes' exhibit No. 2 as, for example, on a separate page. The other pages of these two exhibits are identical; Holmes' exhibit appears to be a photocopy of Landmark's exhibit that was made prior to Holmes' signing of both documents. The witness testified that before he signed these two documents he had not, to his knowledge, discussed or negotiated the conditions of sale appearing in Landmark's exhibit No. 1 with Jimmy Maxwell or anyone else from Landmark. After Richard Holmes signed the two documents, Jimmy Maxwell took with him Landmark's exhibit No. 1 and left with the witness Holmes' exhibit No. 2. The witness, who has a degree in engineering from the University of Illinois and has been in the construction business most of his life, testified that he made no inquiry that he knew of concerning the condition of sale referred to on Holmes' exhibit No. 2, saying, "Well, I would have, yes, when I saw a note like this, I would have looked at the back side. If there were none, then being an engineer, it says what it says, it is what it is."

Landmark called as a witness Joe DeAngelo, who had been

Holmes' superintendent, or project supervisor, while the Country Village apartment project was going on. He described Lynn Holmes as having been above him in the chain of command and himself as the person responsible for the day-to-day building activity at all three sites. At the time of trial the witness was no longer in Holmes' employ. It is undisputed that the siding affixed by Landmark as a part of its prefabricated wall panels was Champion Sturbridge siding; Landmark used that particular siding because it had been specified by the architect. This siding was not made by Landmark but was manufactured by Champion International Corporation (hereafter referred to as Champion), which is not a defendant herein. Landmark purchased the siding from Champion and sold it to Holmes. At the jobsite prefabricated wall panels, with the siding attached, are put into place with the use of a crane. The witness described Champion Sturbridge siding as "a pressed board or composition board, fiberboard," or "what carpenters would call cheap siding," an inexpensive, "low quality siding." During the course of construction of the three apartment complexes, this siding buckled severely and was removed and replaced. According to the witness, moisture caused the siding to expand and buckle. "I think," he said, "the material that the siding is made of has a tendency to absorb moisture, whether it be rain or humidity, and as it absorbs moisture, it expands." He described this siding as "notorious for expanding." The witness defined a vapor barrier as "a water proof membrane" used between the stud and the sheetrock on the exterior walls of a structure to prevent moisture from penetrating the wall. He said that a polyethylene is generally used as a vapor barrier. The witness did not think, upon the basis of his own experience, that the presence or absence of a vapor barrier had anything to do with the buckling of the siding because a vapor barrier is used in heated areas of a structure to keep moisture outside from penetrating the interior. He stated further that, although the nails used by Landmark to attach the siding were not those specified in the siding manufacturer's installation sheet, the nails were, in his opinion, "adequate." On cross-examination the witness testified that there was "severe" buckling of the siding at all three sites and that the siding was unacceptable to the owner, to the architect, to Holmes, and to the inspector for the Illinois Housing Development Authority, which provided the financing for the project. Although much of the siding could be and had been applied to the wall panels by Landmark prior to shipping them to the jobsites, some of the siding must be applied at the job site, and Holmes so applied it. The witness expressed the opinion that the people who had worked under him had not done anything to

the siding to cause it to buckle as it did, adding that, although he would have expected some buckling, the siding had "buckled worse than I would have expected it to."

Another witness for Landmark was Max O'Donnell, Landmark's general manager and president since March or April of 1983. He testified on cross-examination that, because of certain credits by Landmark to Holmes, the amount of the contract price of $786,262.60 remaining unpaid by Holmes was $89,399.12. Concerning the vapor barrier, he indicated that Landmark installs insulation in the wall panel "depending upon the customer's order." Here the manufacturer of the Champion Sturbridge siding had specified two ways that insulation was to be installed, as set forth in Holmes' exhibit No. 9, depending upon whether the insulation was to be installed merely as insulation or whether it was to serve as a vapor barrier as well. If insulation with an "integral vapor barrier" is used, tabs accompanying the insulation must be stapled on the side of the studs facing the interior of the structure so that a vapor barrier that is continuous is created. Otherwise installed, the insulation does not serve as a continuous vapor barrier; in such a case, a six mil polyethylene film, known by the trade name of Visqueen, is required to be applied as a continuous vapor barrier over the insulation. The witness indicated that in the kind of construction engaged in by Landmark, the insulation cannot be used as a continuous vapor barrier for two reasons: (1) because in "panelization" there is a gap where the two panels come together and (2) because electrical boxes and the like have to be installed at the site and the installation of such items would require tears or breaks to be made in the "continuous blanket" of the continuous vapor barrier, with the result that the requirement of the continuous vapor barrier would not be met. He stated that it is standard practice in the industry for an owner or a contractor to purchase insulation with an integral vapor barrier and then to go ahead and purchase an additional vapor barrier to cover it. Asked whether the "plans and specs on these jobs called for the installation of Visqueen vapor barrier over this," the witness answered, apparently referring to an exhibit of wall panel not made available to this court upon review:

> "Yes, sir, it does, unless if I went back and done my work right, there's been a little line typed in the architect's specs over which would be above the standard that says that if it's not installed like this, then a 6 mil polyethylene must be installed prior to the drywall after, well, it doesn't say anything about the electrical boxes, those are the main reasons for it. See, if you again would take a piece of wiring, you're going to

have to cut into this stud somehow to drill holes to run this wiring from box to box; either that, or if you run it from top to bottom, you're still going to have to get in there."

Landmark called as a witness Michael E. Sheppard, the designing and inspecting architect on the three Country Village projects. He agreed with the view he had earlier expressed that the presence or absence of a vapor barrier was totally insignificant with respect to the buckling of the siding because, when the buckling was first noticed, the buildings were not framed or completely enclosed and there was no heat in them. The witness had first learned of the buckling of the siding by a telephone call on December 6, 1982, and inspected all three sites himself two days later. The witness had in his field reports of December 8, 1982, noted that "[w]here siding was installed by panel manufacturer and siding is not complete between first and second floor-siding should be protected to prohibit any water from penetrating behind siding, most specifically at the top edge." In his field report of December 21, 1982, he referred to measures necessary to protect work in place, including exposed sheathing. He stated that, based upon that observation, the sheathing still had not been protected. He had been concerned, he said, about moisture getting behind the siding, that is, between the siding and the sheathing, because the presence of such moisture could contribute to the buckling or warping of the siding. Asked on cross-examination whether, in his opinion, "this was just inferior siding," he responded that "my opinion would be that that product, the performance of it and the extent of the problem was a result a [sic] manufacturing problem as much or more so than it was some of the other questions that were raised." He expressed the view that the difference in the nails specifically recommended by the manufacturer of the siding and those used by Landmark was "insignificant." It appears that on December 23, 1982, the Illinois Housing Development Authority had determined that no further payouts would be made until the problem with the siding was resolved. He stated that if the buckling condition of the siding had not been corrected by Holmes, the buckled siding would not have been acceptable to him as the inspecting architect and he would have recommended to the owner that it was unacceptable. As general contractor, he said, Holmes was responsible for correcting that condition. The witness had found no difference in the buckling of the siding whether applied by Landmark or by Holmes.

Holmes called as a witness concerning its counterclaim Tom Logan, a builder and developer and the owner of the project in question. He testified that all three sites had similar problems, that the problem

in some places was more severe than in others, but that the buckling was "generally everywhere." Before this job, he said, he had built 300 to 400 residential buildings or units; based upon his experience in the construction industry in building these residential units, he stated, the siding he observed on his units in December of 1982 would not have been acceptable to any owner anywhere.

Pertaining to the counterclaim, Richard Holmes testified that in January of 1983 Holmes started tearing off and replacing the Champion Sturbridge siding, used at all three sites. Holmes removed and replaced the siding itself after Lewis Martin had told the witness that Landmark could not send "field personnel down and do this work in the field." Landmark provided the replacement siding to Holmes. The replacement siding was the same kind of siding used originally, that is, Champion Sturbridge, which was, upon replacement, accepted by both the owner and the architect. The witness testified and was cross-examined at length concerning the expenses incurred by Holmes associated not only with the removal and replacement of the siding but also with errors made by Landmark and corrected by Holmes that were not related to the siding problem. The witness stated that Holmes had never sent an invoice to Landmark for the expenses associated with removing and replacing the siding, but that while this work was being done, he had had regular discussions with Lewis Martin in order to coordinate the sending of materials to the sites. The witness said further:

> "[Landmark] could not come down and help us out and were not giving us any help. I.H.D.A. was telling us get this done or we will finish the job and send you the bill, which could have been devastating. So at that point we were really focusing on trying to complete this project, get things organized and squared up and save our butts, really. And we weren't nearly as concerned with sending paper through the mail and billing and this, that and the other. Landmark knew we were incurring these costs, they knew we were talking about charging them for them. I knew that they were saying that we're not in agreement with this. But at this point we were just trying to get done what we had to get done."

Richard Holmes testified, with the aid of summary exhibits, that Holmes' total cost of removing and replacing the siding at the site in Anna was $45,606.75, at the site in Vienna was $24,827.21, and at the site in Metropolis was $29,978.64. The charges for expenses not associated with the problems related to buckling of the siding, he testified, amounted to $42,408.33; he described these charges as "more

average, normal, run of the mill type charges, errors that had to be field corrected," most of which had been incurred, he thought, prior to the development of the siding problem. Such charges included expenses for completing work specified by the architect but omitted by Landmark. Asked whether there was anything unusual about having these kinds of back charges on a project, the witness responded, "Not really, no, everybody makes mistakes." The witness indicated that invoices had been sent to Landmark for these charges, stating, "[W]e generally would call them to let them know about it. We would have to correct the work and then we would send an invoice in. If [*sic*] fact, we even had a meeting at one point to approve almost every one of those invoices." The meeting had been held in November or December of 1982 with Lewis Martin and an owner or major stockholder of Landmark. All of these expenses together, those for the removal and replacement of the siding and those for expenses unrelated to the buckling of the siding, amount to $142,820.93.

Among the charges unrelated to the buckling of the siding appears to be a payment of $14,108.50 by Holmes to a subcontractor, "Phillips and Arnold," for repairs and application of Visqueen on exterior walls at all three sites; the witness explained as follows Holmes' claim for this charge against Landmark:

"Well, this was the removal of the sheet rock that was already on the walls and the installation of the vapor barrier. When I.H.D.A. and the architect and so on disallowed and came back and said the nails were wrong, the vapor barrier is done improperly and you must tear off all siding and replace it, on those areas where we already had sheet rock on the opposite—on the interior face of the wall, the only way to correct that vapor barrier was to tear the sheet rock off and put a vapor barrier on there, the Visqueen, and then put the sheet rock back on. We had all this sheet rock work subcontracted to this Phillips and Arnold anyway as doing the original work. So we had them go in and remove that old sheet rock, correct the vapor barrier and then put it on, as well as put vapor barrier over the remaining exterior walls."

Holmes' employees apparently also spent time removing sheetrock, and Holmes sought damages as well for wages so paid. The witness testified that, whether the vapor barrier had anything to do with the buckling of the siding, it had not been installed properly, "according to Champion specifications," to provide for a vapor barrier. He indicated that, if the insulation is stapled according to the instructions in Holmes' exhibit No. 9, a continuous vapor barrier exists and there

would be no need to apply the Visqueen. He testified further that insulation with an integral vapor barrier, such as was provided here by Landmark to Holmes, is more expensive than insulation without such a barrier. It is inaccurate to say, he testified, that if Landmark applied the insulation according to the "specs," Holmes could not do its job in the field. Asked how Holmes would deal with the problems Max O'Donnell had discussed concerning installation of the insulation according to the specifications, the witness responded:

> "The same way you would if you have to install a box in that panel, you have to cut that insulation. Now that box that he showed us will not squeeze into a depth of that space. When you put that box on there and nail it on, you're going to punch a hole in that insulation. That's just a fact of life and it happens every day all the time. The wiring can be run horizontally, it can also feed straight down from the top. When you do that, whether you're in that panel or this panel, you press the insulation back, the wire comes down in front of it and the sheet rock or whatever goes over the face of it. It's just the way it works. It isn't a perfect system but that's the way they're built."

On cross-examination he was asked whether it was readily apparent to him by looking, it seems, at one or more exhibits of wall panels that no vapor barrier was present. To this question the witness responded in the affirmative.

In its judgment the trial court expressly found that there was no agreement between Landmark and Holmes to disclaim any warranty or warranties regarding the siding in issue and that the siding furnished to Holmes by Landmark was not merchantable as required by section 2—314 of the Uniform Commercial Code (Ill. Rev. Stat. 1981, ch. 26, par. 2—314) because the siding was not fit for the ordinary purposes for which siding was used; of even kind, quality, and quantity within each unit and among all units involved; of fair, average quality within each description; and was not merchantable and was, therefore, defective. The trial court found that judgment should be rendered for Holmes against Landmark on the counterclaim in the amount of $53,421.81, which figure is expressly ascertained by deducting $89,399.12, the amount of the contract price remaining unpaid by Holmes, from $142,820.93, the amount of all of the damages claimed at trial by Holmes. The award of damages was not itemized in any way.

We turn first to the issue whether the contract between Landmark and Holmes contained a valid disclaimer of warranties pursuant

to section 2—316 of the Uniform Commercial Code. Landmark contends that paragraph 10(b) on the back of the first page of Landmark's exhibit No. 1 specifically mentions the warranty of merchantability, that paragraph 10(b) is conspicuous, and that Landmark's exhibit No. 1 and Holmes' exhibit No. 2 should be construed together, giving effect to the disclaimer of warranties contained in Landmark's exhibit No. 1. Landmark urges the "course of performance" of Holmes in not having billed Landmark for any charges related to removal and reinstallation of siding as evidence of the parties' intent that warranties were disclaimed and that Holmes believed its remedy was replacement of the siding as specified in Landmark's exhibit No. 1. Holmes takes the position that the plaintiff, Landmark, failed to show that the parties agreed to disclaim or limit warranties, contending that Landmark's argument concerning disclaimer is "based entirely upon an agreement which it failed to prove and which the trial court found did not exist."

■■ ■ The findings and judgment of the trial court in nonjury cases will not be disturbed by the reviewing court if there is any record evidence to support the finding. (*Briggs v. Gaddis* (1985), 133 Ill. App. 3d 704, 479 N.E.2d 350.) An appellate court takes a deferential approach to findings of fact made by the trial court and will not substitute its judgment unless the findings are against the manifest weight of the evidence; for a judgment to be against the manifest weight of the evidence, it must appear that the conclusions opposite to those reached by the trier of fact are clearly evident. (*First Security Bank v. Bawoll* (1983), 120 Ill. App. 3d 787, 458 N.E.2d 193.) In view of the evidence presented, we think that the trial court could reasonably have concluded from the testimony of Richard Holmes, whom it apparently found to be a credible witness, that at the time of signing the two documents, which were provided by Landmark, his attention was called to the back of the first page of Holmes' exhibit No. 2 by the words in bold print on the front of that page, "PER 'CONDITION OF SALE' REVERSE SIDE," but that, upon examination, the reverse side of the page proved to be blank. Inasmuch as the front page of Holmes' exhibit No. 2 appears to be a photocopy of the front page of Landmark's exhibit No. 1, Richard Holmes could have inferred that the back of the front page of Landmark's exhibit No. 1 was, likewise, blank. After the two documents were signed, Landmark's representative, Jimmy Maxwell, took Landmark's exhibit No. 1 with him, leaving Holmes with its exhibit No. 2 containing no disclaimer. Jimmy Maxwell, who was the only representative of Landmark present when the documents were signed, did not testify. In

fact, Richard Holmes was the only person who testified concerning the actual signing of these two documents. Further, he stated that to his knowledge he had neither discussed nor negotiated with Jimmy Maxwell or anyone else from Landmark the conditions of sale appearing on the back of the front page of Landmark's exhibit No. 1 prior to signing the two documents. His testimony was not contradicted. In light of Richard Holmes' explanation concerning Holmes' failure to bill Landmark for the expenses associated with the removal and replacement of the siding, the trial court could have concluded that Holmes' "course of performance" in this regard did not indicate a belief on its part that its remedy was replacement of the siding. The trial court could have determined from the evidence that Holmes had no knowledge of the disclaimer of warranties, or reason to believe that such a disclaimer existed, at any time prior to and during the execution of the contract and could not, therefore, be deemed to have assented to such a term. The evidence in the record supports the trial court's finding that there was no agreement between Landmark and Holmes to disclaim any warranty concerning the siding in question. Hence, we will not disturb that finding.

As its second issue raised for review, Landmark asks us to consider whether the contract between Landmark and Holmes contained a valid limitation of remedies pursuant to section 2—719 of the Uniform Commercial Code. Landmark asserts for the reasons stated in support of its first issue that the terms of paragraph 10(b), on the back of the first page of its exhibit No. 1, should have been found to be a valid part of the contract. However, in light of our holding concerning the first issue presented, we need not consider this one further.

With respect to the third issue raised, whether the damages awarded to Holmes on its counterclaim were supported by the evidence, Landmark observes that Holmes claimed two kinds of damages, one for charges related to the replacement of the siding and the other for "more 'run of the mill charges' not related to the siding problem." Landmark disputes the award of damages for the removal of the sheetrock and the installation of the vapor barrier, contending that they were awarded as consequential damages for breach of the implied warranty of merchantability; Landmark views these damages, which include the sum of $14,108.50 paid to Phillips and Arnold, as falling within the category of damages related to the siding problem, arguing that they were improperly awarded as consequential damages arising out of the breach of warranty. However, the record indicates that Holmes did not seek reimbursement for expenses related to the

removal of the sheetrock and the installation of the vapor barrier as consequential damages arising out of the breach of the implied warranty of merchantability associated with the buckling of the siding.

■ At trial Holmes put on evidence, through the testimony of Richard Holmes, indicating that the Illinois Housing Development Authority and the architect had determined that Landmark had not created a vapor barrier by applying the insulation as specified by Champion and that, as a result, the sheetrock had to be removed and Visqueen affixed to create a vapor barrier. The trial court heard the conflicting views of Landmark's witness, Max O'Donnell, and Richard Holmes concerning the installation of the insulation according to Champion's specifications in order to create a vapor barrier. As the trier of fact, the trial court could have believed that Landmark should have installed the insulation as directed by Champion and that, had it done so, the need to install Visqueen, and the necessity of removing the sheetrock to do so, would have been obviated. Landmark argues that "[i]t was also obvious to those Holmes employees installing the wall panels that they did not contain a vapor barrier at the time they were installed when the original sheetrock was put over them." The record shows that Richard Holmes testified that it was readily apparent to him by looking, apparently, at an exhibit of a wall panel, that there was no vapor barrier in the panel. However, the record does not indicate that the absence of the vapor barrier was apparent to those employees of Holmes dealing with the wall panels in the field prior to or at the time of the initial installation of the sheetrock. Since the figure of $14,108.50 appears in Holmes' exhibit No. 14 as a charge "not associated with buckling problems," Holmes appears not to have been seeking these damages as a consequence of Landmark's breach of the implied warranty of merchantability related to the buckling of the siding. The trial court apparently concluded that these damages occurred as a consequence of Landmark's failure, as alleged in the counterclaim, properly to affix the vapor barrier in accordance with Champion's specifications and awarded them accordingly. Since these damages appear not to have been awarded as a consequence of the breach of the implied warranty of merchantability, we need not consider further Landmark's allegation of error in that regard.

■ Landmark questions the trial court's award of damages for expenses associated with the protection of sheathing using felt, arguing that the buckling of the siding did not cause the need to protect the sheathing. Landmark asserts that because some areas of the wall panels provided by Landmark were not able to be covered with siding at the time of manufacture but had to be covered at the site by

Holmes, there were some areas where sheathing was exposed regardless of whether the siding subsequently buckled. Landmark contends that any damage award to Holmes should have excluded those charges for protecting sheathing that could not be covered with siding at the factory because these were expenses that Holmes would have borne whether or not the siding buckled. However, the trial court could have concluded from the testimony of Richard Holmes that none of the sheathing in question would have to have been protected had it not been for the delay occasioned by the buckling of the siding:

"As Michael Sheppard stated yesterday, he was concerned and kept noting on his reports that he was concerned about water getting behind the siding and the sheathing. We didn't share as much of that concern as he did because, after all, it was only a week or two after we had noticed the problem that he started noting all this. The siding wouldn't have been exposed any longer than that anyway. At any rate, in order to comply and to keep them happy, we started installing felt over all of the areas that they were concerned about and so on until everything could be taken off and replaced and so on. And we spent considerable time covering up a lot of this building with felt."

Thus, the award for such damages was supported by the evidence, and the trial court did not err in awarding them as a consequence of the buckling of the siding.

██ With regard to damages awarded in the category of what Landmark calls "non-siding related damages," Landmark argues that because the trial court made no finding that Landmark had breached its contractual obligations in any way other than by breach of the implied warranty of merchantability concerning the Champion Sturbridge siding, non-siding-related damages should not have been awarded. "As a result of such findings," Landmark argues, "the Defendant could only recover those direct and consequential damages, relating from the breach of the implied warranty of merchantability as to the siding." Since the non-siding-related damages, amounting to a total of $42,408.33 in Holmes' exhibit No. 14, were unrelated to the siding and to the breach of the implied warranty of merchantability pertaining to the siding, Landmark reasons that the non-siding-related damages were improperly awarded to Holmes. "It was error," Landmark asserts, "to award damages not related to the breach of warranty found by the trial court." However, as Holmes points out, the trial court need not make any findings of fact; in the review of a judgment, the court will assume that all issues and controverted facts

were found in favor of the prevailing party. (*Nemeth v. Banhalmi* (1984), 125 Ill. App. 3d 938, 466 N.E.2d 977.) An award of damages made by the trial court sitting without a jury will not be disturbed on appeal unless it is manifestly erroneous. (*Lynch v. Precision Machine Shop, Ltd.* (1982), 93 Ill. 2d 266, 443 N.E.2d 569; *Hough v. Mooningham* (1986), 139 Ill. App. 3d 1018, 487 N.E.2d 1281.) Not only was the trial court's award of damages for the removal of the sheetrock and the installation of a vapor barrier supported by the record, as discussed above, but Richard Holmes testified concerning the other non-siding-related damages as shown in Holmes' exhibit No. 14, which indicates a total of $42,408.33 for such damages. Examination of the record reveals that the award of damages in this amount for non-siding-related damages was not against the manifest weight of the evidence, and we do not disturb it.

In the fourth issue it raises for review, Landmark contends that Holmes' exhibits Nos. 11, 12, 13, and 14, consisting of summaries of expenses incurred by Holmes, should not have been admitted into evidence. Holmes' exhibits Nos. 11, 12, and 13 were summaries of charges related to the buckling of siding at the Anna, Vienna, and Metropolis sites respectively. Landmark disputes the accuracy of these summaries, arguing the unreliability of some of the underlying data supporting the summaries as revealed by Richard Holmes' testimony. Holmes' exhibit No. 14 is a summary of charges not related to the buckling of the siding. Landmark contends that this exhibit was inaccurate, unreliable, and should not have been admitted into evidence.

■■ ■ The admission of exhibits into evidence is largely within the discretion of the trial court; furthermore, the admission of exhibits into evidence which contain a summary of testimony given is within the discretion of the trial court. (*Kohutko v. Four Columns, Ltd.* (1986), 148 Ill. App. 3d 181, 498 N.E.2d 522.) Where a proper foundation is laid for the admission of summary evidence, the trial court does not abuse its discretion. (*Kohutko*, 148 Ill. App. 3d 181, 498 N.E.2d 522.) When original documents are voluminous and cannot conveniently be examined to extract the fact to be proved, any competent witness who has seen the originals may testify to the fact, provided it is capable of being determined by calculation. (*In re Marriage of Westcott* (1987), 163 Ill. App. 3d 168, 516 N.E.2d 566; *Murray v. Kleen Leen, Inc.* (1976), 41 Ill. App. 3d 436, 354 N.E.2d 415.) In addition, the documents summarized must be available in court or made available to the opponent. *Westcott*, 163 Ill. App. 3d 168, 516 N.E.2d 566.

Richard Holmes testified that the figures on the summaries were

derived by him from "this stack of documents that is approximately a foot thick," by which he appears to be referring to documents present in the courtroom. He testified that the "stack of documents" contained time sheets used by Holmes to prepare its payroll and charge sheets. Asked, "And just tell us how much work is it to actually get in those documents and pull out these figures and compute those?" the witness answered, "It took an awful lot of work, it's last several weeks work." In its brief Holmes states that "the records underlying the summaries were made available to the court and the plaintiff," citing its two-page memorandum of law to the trial court, filed on October 24, 1988, on the issue of the admissibility of summaries. In this memorandum Holmes states that the four summaries detail the particulars of the back charges it claims against Landmark and are based upon the business records of Holmes, which "consist of thousands of pages of documents that are over one foot thick." Holmes states further in the memorandum, "These documents have been bound and identified by category. All such documents have been served upon Landmark along with copies of the summaries." Holmes concludes its memorandum by stating, "Here, the underlying records have not only been produced to Landmark, but summaries themselves have also been produced. Also, the underlying records have been categorized for the convenience of the court and opposing counsel. Finally, all such documents are before the court." In its reply brief Landmark neither addresses nor denies Holmes' assertions in this regard.

■ The record seems to indicate that the voluminous records were available to the court and to opposing counsel for purposes of inspection and cross-examination. Further, Richard Holmes testified at length upon both direct and cross-examination concerning not only the material contained in all four of the summary exhibits but also material contained in documents from which this witness derived information incorporated by him into the summary exhibits. Some of this material is included in the record for review, such as Holmes' exhibits Nos. 17, 18, and 23, which were not offered into evidence by either party but are comprised of time sheets for back charges for each of the three jobsites, which Richard Holmes identified as records having been made in the regular course of Holmes' business. Similarly, Richard Holmes testified concerning other of Holmes' exhibits not offered into evidence but included in the record for review and comprised of invoices pertaining to non-siding-related charges. We do not agree with Landmark that all of what it describes as "inaccuracies" truly are such when Richard Holmes' testimony concerning these matters is examined in context. Furthermore, we think that

Landmark's concerns about such inaccuracies are here properly directed to the weight to be given the summary exhibits rather than to their admissibility. Under the circumstances, the trial court appears not to have abused its discretion in admitting the four summary exhibits into evidence.

Landmark presents two further issues for review: whether Holmes met its burden of proof to show the absence of an intervening cause of the buckling of the siding and whether one who provides materials specifically designated in a construction contract is liable if those materials are defective or are later shown to be unsuitable. However, the cases Landmark cites in support of each of these issues, *Griese v. Cory Pools, Ltd.* (1978), 58 Ill. App. 3d 256, 373 N.E.2d 1383, and *St. Joseph Hospital v. Corbetta Construction Co.* (1974), 21 Ill. App. 3d 925, 316 N.E.2d 51, respectively, are inapposite to the instant one, and we consider the arguments advanced to be without merit.

Affirmed.

HARRISON and WELCH, JJ., concur.