THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CHRISTOPHER JASON WAGNER, Defendant-Appellant.

Fourth District   No. 4—88—0574

Opinion filed October 19, 1989.

KNECHT, J., dissenting.

Daniel D. Yuhas and Lawrence Bapst, both of State Appellate Defender's Office, of Springfield, for appellant.

Scott H. Walden, State's Attorney, of Quincy (Kenneth R. Boyle, Robert J. Biderman, and Gwendolyn W. Klingler, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

Following a bench trial, defendant was convicted of attempt (murder) and armed robbery, in violation of sections 8—4, 9—1, and 18—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, pars. 8—4, 9—1, 18—2). Defendant was 16 years old at the time of trial, but he was tried as an adult, pursuant to section 5—4(6)(a) of the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1987, ch. 37, par. 805—4(6)(a)). Shortly after the trial, defendant pleaded guilty to three counts of burglary. (See Ill. Rev. Stat. 1987, ch. 38, par. 19—1.) The

circuit court of Adams County sentenced defendant to a term of 22 years' imprisonment for attempt (murder), 15 years' imprisonment for armed robbery, and four years' imprisonment on each of the three burglary convictions. The sentences were to be served concurrently. In addition, defendant was "ordered to pay restitution as set forth in the Presentence Investigation Report as to each victim." In particular, the court ordered defendant to pay $44,568 to the victim of the attempt (murder) and armed robbery. Defendant appeals his convictions and sentences for attempt (murder) and armed robbery.

On appeal, defendant raises the following issues: (1) the trial court erred in finding defendant guilty of attempt (murder) because the court concluded defendant did not necessarily have an intent to kill, but that he did have an intent to commit great bodily harm; (2) the court erroneously denied defendant's motion to suppress because his confessions were induced with the promise that he would be prosecuted under the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 701—1 *et seq.*); and (3) the order of restitution in the amount of $44,568 should be vacated because defendant will not be able to pay the sum within five years. Defendant has not challenged his convictions and sentences for burglary, and we will not address them. The pertinent facts follow.

Shortly before closing time on November 16, 1987, a man with a shotgun robbed a Clark oil station at 30th and Main Streets in Quincy, Illinois. The lone attendant, Mark Smith, testified he did not see the man's face, as the man was wearing a black ski mask. He was also wearing a green Army jacket and carrying a shotgun. The man kicked open the door to the back room and shot Smith immediately after entering the room. Smith was able to reach a telephone and call police after the man moved to the front of the station. Another witness, the station manager, testified that a small amount of cash was taken from the register. The man escaped before police arrived.

Defendant was arrested in West Quincy, Missouri, on March 2, 1988. Defendant was wanted for questioning in Illinois on unrelated burglary matters, and he was transferred to the Adams County Youth Home in Quincy, Illinois. On March 3, 1988, defendant was questioned on three different occasions between 1 and 7 p.m. During the final interview, he confessed that he was the one who robbed the Clark oil station and shot Mark Smith. Based on the information obtained from defendant on March 3, the police recovered the shotgun, ski mask, and green Army jacket.

An amended information was filed on March 31, 1988, charging

defendant with attempt (murder) and armed robbery, stemming from the incident at the Clark oil station. In addition, defendant was charged with six essentially unrelated counts of burglary and theft. Although he was only a 16-year-old juvenile, defendant was charged as an adult because of the presence of the armed robbery offense. Section 5—4(6)(a) of the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1987, ch. 37, par. 805—4(6)(a)) requires a juvenile, who is at least 15 years of age, to be charged as an adult if he is charged with the commission of certain offenses. Armed robbery committed with a firearm is one of the offenses specifically mentioned. The court did grant defendant's motion to sever the more serious counts of attempt (murder) and armed robbery.

Defendant filed a motion to suppress, alleging that his confession on March 3 had been induced with the promise that he would be tried as a juvenile, and not as an adult. The court heard testimony over two days and concluded that defendant's confession was voluntary. The court made the statement that defendant could have entertained a reasonable belief that he would be tried as a juvenile based on some of the comments made by the interrogating officers. However, the officers made no promises to defendant in return for his confession, and there was nothing said by the officers that was intended to induce or coerce a confession. The officers gave all the proper warnings prior to obtaining defendant's confession. Defendant was simply not told he would be tried as an adult for armed robbery because of statutory requirements.

Defendant subsequently waived his right to a jury trial, and a bench trial was held on June 7, 1988. He was found guilty of armed robbery and attempt (murder). On the attempt charge, the court concluded it could not clearly find defendant intended to kill when he fired the shotgun. However, the court found defendant clearly intended to commit great bodily harm.

Following defendant's bench trial, defendant negotiated a guilty plea on the remaining charges against him. He was sentenced as above stated and ordered to pay restitution in the sum of $44,568 to Mark Smith, the attendant at the Clark station.

Defendant first argues his conviction for attempt (murder) must be vacated because the court based the conviction on erroneous grounds. The State concedes the court committed error and requests that we reduce the conviction to aggravated battery.

The trial court found defendant guilty on both charges for which defendant was tried at the bench trial. In making its findings, the court explained its rationale for finding defendant guilty. As to the

attempt (murder) charge, the court stated:

"You went in there with the gun ready. You had a shell in the chamber and you shot that gun just like that for really no apparent reason. And you shot the individual at close range.

So whether or not you really intended to kill him, I really don't know that. I can't find that that is what your true intent was, but there certainly can be no question but what you intended to do great bodily harm. \*\*\*

A person who didn't want to ever use that weapon wouldn't bother to even load it. They would just take the gun in and hope to be able to commit the crime without doing anything more than scaring the individual into believing that it may be loaded. You went fully prepared to do whatever you had to do. You have admitted to the police that if you had to shoot someone you didn't want to kill them. You just wanted to hurt them bad enough to complete the crime. So, perhaps in your youth you thought you could intentionally shoot somebody with the safety of knowing that you weren't really going to kill them. You were just going to seriously hurt them.

That is why the law makes it against the law to shoot someone under those circumstances. It makes it attempt murder. The law doesn't have to prove absolutely that your mind set was to kill somebody. The law has to prove that you committed the acts under circumstances where you knew that it would cause great bodily harm.

Anyone had to know that what you were doing and what you did would cause great bodily harm to someone when you shot them from perhaps three or four feet with a sawed off shotgun regardless of the type of shell you had in it.

I can't really consider your statement to the police as to a confession as to Count II. It's only an admission that you fired the weapon. You have made exculpatory statements about your intent and about your intention to even fire the gun. But it seems to me clearly that the evidence supports the conclusion beyond a reasonable doubt that you intended to use the weapon and that you intended to do great bodily harm to Mark Smith."

From these statements, it becomes clear the trial court based defendant's conviction for attempt (murder) on the ground that defendant intended great bodily harm to the victim.

    ■ Illinois law is clear that an intention to commit great bodily harm will not be sufficient to convict on a charge of attempt (mur-

der). An element of attempt (murder) is a specific intent to kill. (People v. Harris (1978), 72 Ill. 2d 16, 27, 377 N.E.2d 28, 33; People v. Trinkle (1977), 68 Ill. 2d 198, 201-04, 369 N.E.2d 888, 890-92.) The trial judge expressly stated he could not find that intent. Accordingly, we must vacate the conviction and sentence for attempt (murder).

■■ ■ The trial court's finding that defendant intended to commit great bodily harm does support the offense of aggravated battery. (Ill. Rev. Stat. 1987, ch. 38, par. 12—4(a).) Under the authority of Supreme Court Rule 615(b)(3) (107 Ill. 2d R. 615(b)(3)), a reviewing court may reduce the conviction to one of a lesser degree where an included offense is involved. (People v. Trinkle (1976), 40 Ill. App. 3d 730, 734, 353 N.E.2d 18, 22, aff'd (1977), 68 Ill. 2d 198, 369 N.E.2d 888.) In this case, aggravated battery is an included offense of attempt (murder). A review of the evidence indicates defendant intended beyond a reasonable doubt to commit great bodily harm. Further, defendant's act of firing the shotgun caused harm to the victim. Pursuant to the powers granted to us by Supreme Court Rule 615(b)(3), we reduce the degree of the offense from attempt (murder) to aggravated battery. Further, we reduce defendant's sentence to five years, pursuant to the authority given us by Supreme Court Rule 615(b)(4) (107 Ill. 2d R. 615(b)(4)).

Defendant's second argument concerns his motion to suppress. In his motion, defendant alleged that interrogating officers had promised him he would be tried as a juvenile if he confessed to all his misdeeds before he turned 17 years of age. Defendant argues he relied on this promise in giving statements which indicated his participation in the armed robbery of the Clark station and the shooting of the attendant. However, instead of charging defendant as a juvenile, defendant was charged and tried as an adult.

The trial court heard testimony on the motion to suppress over two days and, eventually, denied the motion. Following defendant's arrest in Missouri on March 2, 1988, he was transferred to the Adams County Youth Home in Quincy, Illinois. On March 3, 1988, defendant was interviewed three times by law enforcement officers from Missouri and Illinois. Officer Kelvin Roberts was present at all three interviews and was called first to testify. He stated he is an investigator in the juvenile division of the Quincy police department.

Roberts first interviewed defendant at about 1:30 p.m. at the Adams County Youth Home, along with two Missouri law officers. Prior to interviewing defendant, Roberts spoke with defendant's father at the youth home. Roberts told defendant's father the purpose for the

questioning. Defendant's father stated his preference for not becoming involved and left. Defendant was given his *Miranda* rights by Roberts and the Missouri officers. Roberts stated the rights were individually explained to defendant. In addition, the Missouri officers gave a warning that is part of their standard procedure in dealing with juveniles. The warning reads:

> " 'You must further understand that if a juvenile is fourteen years of age or older, and petition alleges an offense that would be a felony, if the juvenile were an adult, the juvenile could be certified to stand trial as an adult in a court of general jurisdiction. Further, you must understand that any statement you make to a police officer could be used against you in either the juvenile court or the adult court, if such certification were ordered by the court.' "

Roberts testified defendant understood his rights as they were explained to him. Defendant waived his rights and agreed to speak with the officers. The conversation centered on the theft of a vehicle and other burglaries. Defendant confessed to these crimes. Roberts stated defendant was not promised he would be prosecuted only as an adult. No promises were made to defendant. Roberts did testify that he encouraged defendant to admit to all of the crimes in which defendant participated:

> "The only thing I said to him was that—he initially confessed to the first Modern Dairy burglary. I advised him that we had a series of burglaries to the Modern Dairy and that they were all done in a similar way with similar items taken and it would be better for him to confess to all of them at one time rather than for us to have cases surface sometime in the future and, you know, as each separate case—I informed him it would all be handled as one deal, sent to the State's Attorney that way."

Shortly thereafter, defendant was transported from the youth home to the Quincy police department in order to be photographed and fingerprinted. While at the police department, Roberts and Officer Brenda Williams, another juvenile investigator, interviewed defendant. The second interview took place at approximately 3 p.m. Because it occurred so near in time to the first interview, defendant was not asked to sign more waiver forms. He was simply told his same rights were in effect. Defendant again voluntarily agreed to speak with the officers. Defendant was questioned about various matters, including the Clark station robbery. However, defendant denied his participation in the robbery. He did confess to other burglaries

and thefts. Roberts stated no promises were made in this interview.

According to Roberts, defendant stated several times during the interview that he had one more thing he wanted to talk about. When asked about the matter, he claimed to have a hard time remembering. The questioning ceased, and defendant was taken back to the youth home. The officers felt defendant had not confessed to everything because of his hesitation. Based on other answers, the officers suspected defendant was actually involved in the Clark station robbery. Roberts and Detective Robert Mehl returned to the youth home for a third interview. Mehl had come because he had done the investigation of the robbery at the Clark station. As they arrived at the youth home, they were told by staff members that defendant had just asked to speak with police. They met with defendant at about 7 p.m. Roberts stated he went through the *Miranda* process prior to this interview, and defendant waived his rights in order to speak with the officers. Roberts testified that prior to commencing with questions, defendant asked if "this was going to work the same way?" Roberts responded by asking whether defendant meant "this [would] all be included in one package to go to the State's Attorney's Office at one time?" Defendant responded in the affirmative. Officer Roberts agreed. Defendant then confessed to three more crimes, including the Clark oil station robbery.

Officer Brenda Williams also testified at the hearing. She corroborated Roberts' testimony concerning the second interview conducted at the police station. In brief, she stated that defendant was given a reminder that his rights, as explained to him in the previous interview, were still in effect. Defendant denied committing the armed robbery, but confessed to several vehicle thefts and other burglaries. Williams noted that defendant appeared to want to say more but was hesitant to do so for some reason. She also stated no promises were made to defendant concerning the upcoming prosecution. Williams stated defendant was encouraged to confess to everything all at once:

> "We advised him that we would prefer to send it all in one package. That way there would not be additional—one day you would have one thing come in, the next day you would have something else come in. We requested he make a clean slate of it. At that time I felt that he had."

Williams was asked on cross-examination whether defendant had expressed any concern about becoming an adult at age 17. The following colloquy occurred concerning that topic:

> "Q. Was age ever discussed—the fact that at this point he

was still a minor, but when he became 17 he wouldn't be a minor? Do you ever recall any conversation about that?

A. The conversation that I recall was in reference to Chris was worried about it being held against him later in life and whether or not this would all affect him. The—Investigator Roberts discussed with him how to go about having his records expunged.

Q. And could you further tell us what Officer Roberts told him?

A. He mentioned about the expungement, you know, when he reached a certain age. I personally was under the impression that that would require at least ten years since I wasn't sure about the amount of time that it does take to have that done. I don't recall making a comment.

Q. Do you recall what Officer Roberts told him about expungement of his records?

A. They just discussed whether or not it would be held against him later in life. That is the common occurrence with kids."

Defendant testified that he was 16 years old. June 10 was his birthday. He stated that Officer Williams told him he should confess to all his illegal activities before he turned 17 in order to be prosecuted as a juvenile. Defendant stated he contacted the youth home staff following the second interview at the police station because he wanted to let the authorities know of the armed robbery while he was still a juvenile.

On cross-examination, defendant stated he did not remember the exact words used by the officers, but it was his impression that he would be tried as a juvenile if he confessed to all his crimes. He stated that, in asking whether everything would be together, he was hoping he would go to trial at the same time for everything he discussed.

Later, upon further questioning by the court, defendant admitted no one specifically said anything about whether defendant would be prosecuted as a juvenile or as an adult. Defendant stated that the officers encouraged him to confess to all of his crimes before he turned 17. He stated the officers told him he would not have to worry about things coming up later in life if he cleared up everything now. He restated his testimony that Officer Roberts told him it was best if he confessed to his crimes while he was still a juvenile.

Officers Williams and Roberts were recalled to testify by the court following defendant's testimony. Williams denied making any

statement concerning the importance of turning 17, or that defendant would be better off to confess to his crimes while he was still a juvenile. Roberts stated he told defendant that defendant's juvenile record could be expunged after he became an adult. Roberts also stated that he may have told defendant:

> "[I]n general terms that as a sixteen year old or when he turned seventeen he could request that his record be expunged when he turned adult and that as a seventeen year old if he committed a similar crime, talking about the stolen vehicle, that he would go to the Adams County Jail rather than the Adams County Youth Home. That was the total part of that conversation as far as I can remember."

The court did not render a decision but took the matter under advisement.

Four days later, on May 17, 1988, the court reopened the hearing on its own motion. The court heard testimony from Detective Mehl and Officer Roberts. In particular, Officer Roberts was questioned concerning his statements to defendant regarding expunging defendant's juvenile record. The following colloquy occurred:

> "Q. At some point in time did you advise Mr. Wagner about the possibility of his record being expunged if he were charged as a minor?
>
> A. I advised him about, that he could request that his record be expunged. I didn't say anything about the minor part of it.
>
> Q. All right. Back up. Let's back up before that discussion. Just before that discussion occurred, what was the setting?
>
> A. The setting was that I had just went [sic] and got Mr. Wagner something to eat because I was aware that he had only had part of a sandwich for breakfast. I had brought that back to him. He was in the process of fixing his food, putting ketchup on his cheese burger and stuff like that.
>
> \* \* \*
>
> Q. Go ahead, Officer, and tell us what transpired at the point that you had brought the food in and given it to Chris Wagner.
>
> A. Okay. What I believe was misunderstood the first time was he was eating his food in sort of a short break. And I, at that time, assumed the role of a typical role of a juvenile officer.
>
> And I was more or less chewing Wagner out for what he had done. And that's where I stated that if he had done some-

thing like that after he turned 17, he would go to the Adams County Jail rather than the youth home.

That's the only thing. I said that, something to the effect that the only thing good that would come out of it is that he could request that his juvenile record be expunged and I specifically remember using the word 'request.'

Q. This wasn't an answer to any question that Chris Wagner asked?

A. No. He was routinely confessing to anything that he had allegedly done up to that point. There was no need for me to in any way try and coerce him into confessing further.

Q. Did he give you some kind of an audible response or a nod of his head at that particular point when you had mentioned the possible expungement of a record?

A. Yes. He was just nodding his head.

Q. Okay. What happened immediately after that?

A. Well, after he was finished eating and—We continued on.

Q. Well, what happened immediately after you told him about the possibility of requesting your record to be expunged?

A. Nothing.

Q. Okay.

A. He continued to eat.

Q. You said you were taking the role as a juvenile officer in chewing out this minor?

A. That's correct.

Q. How did you go into transition from that point to the further interrogation?

A. It was just a time lapse where he ate. I may have even left the room again. I don't recall, but there was just a little bit of time while he ate, and we couldn't really talk to him while he was eating."

Both Roberts and Mehl repeated the testimony previously given concerning the start of the third interview. Defendant asked if "this [would] work the same way?" Roberts asked if defendant meant the crimes would be turned over to the State's Attorney as one package. Defendant replied "yes."

The court denied defendant's motion to suppress. The court stated it was troubled by the fact defendant was not told about the statutory requirement that he must be tried as an adult for committing armed robbery. However, the court found no wrongdoing on the part of the authorities. The court stated, in pertinent part:

"I find this to be one of the more interesting and probably challenging questions with regard to suppression of the confession that I have seen in my experience. I am very troubled by the fact that the Defendant was not advised that he necessarily would have to be prosecuted as an adult for an armed robbery when the officers were going there to interview him about that armed robbery. At the same time, there is absolutely nothing that I have seen in the evidence to suggest or indicate that the police officers for the Quincy Police Department in any way tried to trick the Defendant, tried to withhold information from him, tried to use any other tactic that might be considered as questionable to obtain a confession from the Defendant.

It seems that the officers, each and every one, have acted in good faith. ***

\* \* \*

I think you always have to look at the totality of the circumstances. And in a situation such as this, you have to look at the good faith efforts of the officers involved, the knowledge of the Defendant involved, and all the other factors surrounding him. And it's my conclusion that the only flaw, if it is one, is that the Defendant wasn't admonished that he necessarily would be charged as an adult, in light of the fact that there was some question and discussion about his record being expunged from which he could have deduced that he necessarily would be charged as a juvenile. And I will make the record clear that from the evidence I would find that it was reasonable for the Defendant to think perhaps he had every expectation to be charged as a juvenile.

I don't think that was an unreasonable conclusion for him to have. And I make that finding knowing full well that an Appellate or Supreme Court may take that and suggest that my ruling today is in error. If so, then so be it.

On the other hand, I don't believe the confessions were in any way involuntary. I have observed the Defendant in the court. While he is quiet and somewhat withdrawn, he is very articulate for a 16-year-old facing charges such as this. He has at all times responded to questioning. He appears to this Court to be above average intelligence for persons in his situation. He was given every admonishment that is required under Illinois law that I'm aware of. And I say that because there is nothing in this statute that I make reference to which goes

ahead and then says that a juvenile defendant must be advised that he will necessarily be charged as an adult. It just says you have to charge him as an adult."

The court also noted, as a factor in its consideration, the fact that defendant had received the supplemental Missouri warning, which indicated a juvenile may be prosecuted as an adult under certain circumstances.

Defendant argues the trial court's determination was in error. Defendant contends the evidence shows defendant was induced to confess by the promise, ever so subtle, of being tried as a juvenile rather than as an adult. Defendant concludes the officers' discussion of expunging defendant's records supports defendant's more explicit testimony that the officers promised he would be prosecuted only as a juvenile. Even if defendant's testimony is not accepted, defendant argues the statements made by the officers can only be interpreted to mean defendant would be prosecuted under the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 701—1 *et seq.*). Further, defendant argues the confessions were made in an atmosphere of coercion. Defendant was merely a 16-year-old juvenile. Yet, he was interrogated three times on March 3. For the second interrogation, defendant was transported to the police station and away from the relative security of the youth home. Defendant contends the evidence indicates he was misled by the officers' statements, and coerced by the environment into making confessions he would not otherwise have made.

■■ ■ A summary of the law regarding admissibility of confessions is found in *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 401, 495 N.E.2d 984, 990:

"The test of whether a confession was admissible at trial is whether the statement met its burden of showing that the statement was made freely, voluntarily and without compulsion or inducement of any sort, or whether defendant's will was overcome when he made the statement. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) In making this determination, the court must look at the totality of the relevant circumstances surrounding the making of the statement, including the existence of any threats, promises, or physical coercions; the length and intensity of the interrogation; and the age, intelligence, experience and physical condition of the defendant. (*People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228, *cert. denied* (1984), 469 U.S. 935, 83 L. Ed. 2d

270-71, 105 S. Ct. 334.) The finding by the trial court on the voluntariness of a confession will not be disturbed on review unless it is contrary to the manifest weight of the evidence. *People v. Davis* (1983), 97 Ill. 2d 1, 452 N.E.2d 525."

When dealing with juveniles, it has been stated that "the utmost care must be taken to insure that the confession was voluntary and not coerced, suggested or the end result of the juvenile's ignorance of his rights or of his adolescent fantasy, fright or despair." (*In re Shutters* (1977), 56 Ill. App. 3d 184, 187, 370 N.E.2d 1225, 1227.) We find from an examination of the circumstances surrounding defendant's confession that the circuit court's decision was not against the manifest weight of the evidence. Defendant's rights were accorded the utmost respect and protection, and defendant's confession was made voluntarily.

██ We reject the notion that defendant's environment suggests a serious element of coercion was present. For defendant's second interrogation, he was transported to the police station in order to be photographed and fingerprinted. Defendant's admissions in the first interview apparently caused the officers to want further discussion with him. This is not unusual. It seems reasonable for police to want to obtain as much information as they can from a talkative and cooperative suspect. At no point was there any indication that defendant resisted the officers' attempts to speak with him. In fact, defendant requested a third meeting with police in order to provide the officers with information concerning his most serious crimes.

██ ■ If there is any problem with defendant's confession, it must come from the disputed statements of the officers concerning a package deal for the State's Attorney and expunging defendant's record. From a review of the circumstances in which they were made, we cannot conclude defendant was coerced or improperly induced into making a confession for armed robbery. If we accept the officers' testimony that defendant was encouraged to confess all of his crimes at once and have everything sent to the State's Attorney in one package, we need find no problem. There is no inherent promise of being tried as a juvenile in this statement. The testimony concerning the topic of expunging defendant's record is a closer question. Yet, Officer Roberts testified that this statement occurred during a break in the questioning. The break was taken in order to allow defendant to eat. There is no indication the officer used this as a tool to obtain a confession for the armed robbery, or any other particular crime. There is no indication of bad faith by the officers involved. The statement was made in general conversation with the

defendant. Defendant may have formed the impression that all of his crimes would result in juvenile prosecution. However, there is no indication this broad based belief came from misleading or improper statements made by the officers. Where the officers have endeavored to protect defendant's rights during discussions concerning criminal activities, as these officers did, we cannot conclude that a general statement concerning the expungement of records served to destroy the voluntariness of defendant's confession. Examining the totality of the circumstances, the confession concerning the armed robbery was made knowingly and voluntarily.

Finally, defendant argues the order of restitution should be vacated as defendant has no hope of completing payments within five years. In this case, the presentence report showed the hospital charges and lost wages of Mark Smith to be $44,568. The court ordered defendant to pay restitution in this amount. However, the court noted such restitution "is a meaningless act for the most part because you have absolutely no ability to pay those sums of money, but certainly while in the Department of Corrections you could not do so." Defendant's term of imprisonment for armed robbery is 15 years and, even with good time credit, he will not realistically be able to complete payment within five years.

■■ ■ The statutory provision for restitution requires the court to determine whether "restitution is an appropriate sentence to be imposed." (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—6.) Subsection (f) of section 5—5—6 of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—6(f)) further provides:

> "Taking into consideration the ability of the defendant to pay, the court shall determine whether restitution shall be paid in a single payment or in installments, and shall fix a period of time not in excess of 5 years within which payment of restitution is to be paid in full."

Restitution is intended to provide the victim of a crime compensation while a defendant is on probation and is able to work or seek work. (*People v. Rupert* (1986), 148 Ill. App. 3d 27, 29, 499 N.E.2d 93, 95.) The fact that a defendant has been ordered to serve a term of imprisonment does not, of itself, render an order of restitution improper. Rather, it is a factor to be considered in assessing a defendant's ability to pay, and in determining the manner and time of payment when fashioning the restitution order. (*People v. White* (1985), 135 Ill. App. 3d 563, 567, 482 N.E.2d 134, 136.) In light of the term of imprisonment imposed upon defendant and the court's comments about defendant's ability to pay, we conclude restitution is

not an appropriate sentence for defendant. We, therefore, vacate that portion of the order requiring defendant to pay $44,568 in restitution.

For the reasons stated above, the order of the circuit court of Adams County is modified in that the attempt (murder) conviction is reduced to aggravated battery. Defendant's sentence for that conviction is also reduced. The order is vacated in that defendant need not pay restitution. The remainder of the order is affirmed.

Affirmed in part; modified in part; vacated in part.

SPITZ, J., concurs.

JUSTICE KNECHT, dissenting:

I respectfully dissent. Supreme Court Rule 615(b)(3) permits a reviewing court to reduce the degree of the offense of which the defendant was convicted. This broad power should only be exercised, as recognized by the majority, when included offenses are involved. What does "involved" mean? The majority notes in this case aggravated battery is an included offense of attempt (murder). The facts do suggest defendant intended great bodily harm to the victim.

However, the offense of aggravated battery was not charged. The offense of aggravated battery was not argued to the court in this bench trial. This was not a jury case where the jury was instructed on but rejected an included offense. Should a court of review search the record and our statutes on each reversal for failure of proof to see if the conviction could possibly be reduced to an offense of lesser degree? It is the role of the prosecutor to charge offenses and to argue for a remedy. When no instruction is offered, and no argument is made about an included offense, then 615(b)(3) is inapplicable.