THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOEL WIESNESKE, Defendant-Appellant.

First District (2nd Division)   No. 1—90—0068

Opinion filed August 25, 1992.

30

Rita A. Fry, Public Defender, of Chicago (Timothy J. Leeming, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Eileen O'Neill, and Clare M. Wesolik, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

Defendant Joel Wiesneske was charged with felony theft from his employer, Schaumburg Datsun, Inc. Following a bench trial, the circuit court found defendant guilty; he was subsequently sentenced to three years' imprisonment and ordered to pay $29,989.14 in restitution. On appeal, defendant contends that the evidence did not establish his guilt of felony theft beyond a reasonable doubt; the circuit court erred in allowing the prosecution to introduce a spread sheet exhibit; he was denied his sixth amendment right in that the circuit court permitted a witness to assert his fifth amendment privilege against self-incrimination; and the circuit court abused its discretion in sentencing him.

The evidence adduced at trial established that, during 1983 and 1984, Thomas Sondag was president and general manager of Schaumburg Datsun, a car dealership. As general manager of the dealership, Sondag would, in the course of his typical duties, oversee the operation of the dealership and work with all the managers, including the office manager, parts manager, service manager, and the two delivery managers. Also during this time, defendant worked for Schaumburg Datsun as one of its two delivery managers, or finance managers. As a delivery manager, defendant collected the money received on all automobiles that were sold by the salespersons and completed the paperwork necessary for delivering a car to a customer.

Marie Bolf, the license and title clerk and cashier, Catherine Williams, the office manager, and Sondag all testified as to the typical procedures involved in the sale of an automobile: initially, the salespersons would negotiate a sale, write a buyer's order form, and bring the customer's deposit money to the cashier. The cashier would then issue a receipt for the customer's deposit; the customer would receive one copy, another copy remained in the cash receipt machine, and yet another copy was put in the deal jacket. The deal jacket, prepared by a salesperson when a car was first received at the dealership, would contain all the paperwork involved in the sale of an automobile. Thereafter, the salesperson would take the customer and the deal jacket to the delivery manager.

The delivery manager would then discuss with the customer the method of payment and the time that the customer would take possession of the car. The delivery manager's first function would be to collect all the money connected to the sale, either through finance contract, cash, check, or credit card; he would then make certain that all the paperwork, including the license and title, tax form, bill of sale, and warranty registration, pertaining to that sale was correct. After the customer paid, the delivery manager would then take the payment to the cashier, who would apply the money to the account number listed on the deal jacket. Occasionally the name on the payment check did not correspond to the name on the deal jacket. After a sale was completed, the information contained in the deal jacket would then be taken to the office manager, who would enter that information into the computer files. The office manager would also, in the course of her regular duties, maintain the dealership's books, the schedules, the ledgers and the journals, and check the numbered receipts issued by the dealership.

Routinely, the dealership would allow customers to take possession of the cars prior to full payment of the purchase price. The decision to allow the customers "early" possession was the delivery manager's; that decision was based upon his determination of the credit-worthiness of the customer. Once a car was delivered to a customer who had not paid in full, that customer's name was then entered in the note list, which contained the stock number of the car, the amount owed to the dealership, and the approximate date that the customer would pay in full. The delivery managers controlled the note list, updating it as customers paid. Although the delivery managers were in control of the note list, both the office manager and Sondag reviewed it occasionally to determine how much was owed to the dealership. Additionally, the office manager would, about once a week, print out a computer list to check that the note list and the information in the computer were in agreement.

In July of 1984, while defendant was on vacation, Sondag attempted to review the amount of money owed to the dealership, but was unable to find the note list. Not finding it in defendant's office, where it would typically be kept, Sondag asked the office manager to prepare a print-out from the computer listing the money due from customers. Sondag was "amazed" at the amount of money still owed the dealership on cars which had already been delivered; accordingly, he called the first customer on the computer list. That customer indicated that he had already paid defendant in full. The

second customer whom Sondag called also stated that he had paid in full. Thinking that there must be some "misunderstanding," Sondag sent mail-a-grams to all the customers on the computer list, stating that they owed the dealership money and that the dealership needed to collect the outstanding balances. Several customers responded to the mail-a-grams, informing Sondag that they had paid cash to a "clerk" in the dealership; several customers identified defendant as the employee they had paid.

Sondag then apprised the dealership's owners, his father, Clayton Sondag and James Kussman, of the computer listing indicating an extensive amount of money still owed to the dealership. After further reviewing the computer listing and all the deal jackets, Sondag prepared a "spread sheet," an accounting ledger summarizing each customer's sale, the money paid, and the money received by the dealership.

Sondag wrote down on the spread sheet the results of each sale: the price of the car, the funds that the customer paid, the funds that were received, and any funds that had been put in another customer's account. The last entry was necessary because Sondag had discovered that certain checks from one customer "got put" into other customers' accounts. Sondag created his "spread sheet" with information contained in the deal jackets, information from customers, and information given to him by Catherine Williams, the office manager. At Sondag's request, Williams prepared a computer listing detailing the money owed and paid by customers. According to Williams, only she entered information into the computer; Sondag never entered information into the computer on his own, nor did he ever tell her what information to put into the computer. After preparing his spread sheet, Sondag determined that approximately $43,000 was missing.

When defendant returned from vacation, Sondag, Kussman, and Clayton Sondag met with him in Sondag's office. There, they confronted defendant with the charge that he was responsible for the missing money. Defendant admitted taking money from the dealership, but stated that he did not know how much. In response to the owners' question whether anyone else was involved in the lapping scheme, defendant answered no. He then agreed to reimburse the dealership and began that day by signing over his $4,000 paycheck. Telling the owners that he needed additional time to raise the rest of the money, defendant left the dealership, promising to return that day at 5 p.m.; however, he never came back to the dealership.

At trial, in addition to Sondag's and Williams' testimony, the State presented the testimony of several customers of Schaumburg Datsun. Suzanne Bobka testified that she purchased a $9,000 car from the dealership on December 27, 1983. On that day she gave a $200 deposit to James Kussman, Jr., the other delivery manager, for which she received a receipt. She then spoke with defendant about the various possibilities of financing. When defendant was unable to obtain financing for her, Bobka obtained her own and returned to the dealership, where she gave defendant a $1,300 cashier's check; defendant, however, did not give her a receipt. Sometime after the sale, she received notice from the dealership that she still owed $1,300; in response, she sent the dealership a copy of her bill of sale and a copy of the cashier's check to show that she had paid in full.

Sandra Biederstadt testified that on November 3, 1983, she purchased a car for $11,420, making a $50 down payment to a salesperson; she was issued a receipt for the $50. After her credit was approved, she met with defendant at the dealership, paying him $500 in cash and giving him a $1,650 personal check. She did not receive the "same kind" of receipt as she had for the $50 down payment; rather she received a "bill of sale" which indicated a $2,150 "cash on delivery" amount due, but did not indicate that that amount had been paid. Later, Biederstadt received notice from the dealership that she still owed $400. She, in turn, contacted the dealership and told Sondag that she had paid in full.

William McNamee testified that on March 30, 1984, he purchased a car from the dealership, giving a $100 deposit to a salesperson, for which he received a receipt. The following day, McNamee returned to the dealership, where he was introduced to defendant and spoke with him about financing the car. McNamee then gave defendant $2,000 in cash, but did not receive a receipt. After receiving notice from the dealership that he still owed $2,000 on the car, McNamee explained to Sondag that he had paid in full.

Gloria Brodie testified that on February 22, 1984, she purchased a car from the dealership for approximately $7,400. She gave a salesperson a $100 personal check and was issued a receipt. She later gave defendant $200 in cash but he did not issue her a receipt. When she was notified of an outstanding balance to her account, she also told the dealership that she had paid in full.

In addition, the State offered by stipulation the statements of 18 customers who had purchased their cars from the dealership and who had given money to defendant.

According to Sondag, from his review of the summary sheet, Bobka's $1,300 cashier's check was applied to another account; $2,100 was missing from Bierderstadt's account; McNamee's account was short $2,000; and, according to the dealership paperwork, Brodie still owed $200. Sondag also testified to the many discrepancies and misapplied or missing funds from defendant's customers' accounts.

Miles Elliot Levine testified for the defense that he worked as an assistant used-car manager at Schaumburg Datsun during 1981 and 1982. He explained that it was common procedure, even requested by Sondag, that customers not be given receipts for their payments, especially when the dealership was busy. Often, the high number of transactions would cause a backlog in the completion of dealership procedures; at these times, the deal jackets containing customer payments would be stacked around the dealership offices. Thus, anyone would be able to handle those deal jackets. Furthermore, all employees of the dealership had access to the note list. According to Levine, Sondag and Williams had final "review" of the deal jackets and the money contained therein.

Levine described the bookkeeping at the dealership as "sloppy" and stated that Sondag "just didn't care" about the delays in collecting money from customers who had already taken delivery of their cars. He admitted on cross-examination, however, that, though he worked with defendant at the dealership in 1981 and 1982, he was not working at the dealership during the period of time that defendant was alleged to have taken money. He further admitted that beyond the initial down payment, if there was money paid to the dealership it would be paid in the finance office and would be given to the delivery managers.

James Emmett O'Connell testified that he was employed by Schaumburg Datsun as a delivery manager in 1978 and 1979. During his employment, deal jackets would often be lying about the dealership. Furthermore, during busy times, receipts would routinely not be given to customers. Later, after O'Connell had left Schaumburg Datsun and had begun working for another Sondag-owned dealership, he was accused of theft and fired.

Gladys Brooks testified that she currently worked with defendant at King Nissan, his present place of business; however, she worked as a receptionist and cashier at Schaumburg Datsun for three months in 1987. While she was at Schaumburg Datsun, Sondag frequently would ask her to take cash from the cash drawer and replace it with "auction" or personal checks. Sondag also asked

her to give him the dealership receipts which documented the customers' payments. When she gave him all three copies, the customers would receive no receipts. Though Brooks never saw the books and never made entries into them, she testified that there were two sets of books.

Defendant testified in his own behalf that, during his employment at Schaumburg Datsun, he would place all the completed forms and the customer's payments in the deal jacket. The deal jacket would then be taken to the cashier by either a salesperson or Sondag. If sales were "slow" at the dealership, defendant would take the deal jacket to the cashier himself. Every one of the sales staff would at some time handle the cash and cash receipts. Occasionally, Sondag would direct defendant to "speed up" the delivery process; Sondag would then handle the "receipting" of money himself and, at times, replace monies from the deal jackets with checks. Sondag, who according to defendant was a heavy gambler, would also remove money from the cash box at least twice a week.

According to defendant, during the three years that he worked at the dealership, three other employees were fired after being accused of theft. Prior to August 5, 1984, however, defendant had never been accused of dishonesty or misappropriation of funds.

On August 5, 1984, defendant was asked into "the office" by Kussman; there, Sondag, Clayton Sondag, and Kussman told him about "all this missing money." Defendant did not admit to the three men that he had taken the money; he did, however, sign over his $4,000 paycheck because they threatened to have his legs broken.

On cross-examination, defendant admitted that when he was asked by the three men how much money he had taken, he told them that he did not know how much. He further admitted that he told the three men, after being asked who else was involved, that no one else was involved.

Defendant attempted to call James Kussman to testify; however, Kussman invoked his fifth amendment right against self-incrimination. Following an *in camera* proceeding and an offer of proof, the circuit court excused Kussman as a witness.

Following closing arguments, the court found defendant guilty of theft, stating that "[t]he most important piece of evidence in this case I think by far is the conversation, the confrontation if you will when the defendant returned from his vacation." After hearing evidence in aggravation and mitigation, the court sentenced defendant

to three years' imprisonment and ordered him to pay $29,989.14 in restitution.

I

Defendant initially contends that he was not proved guilty of felony theft beyond a reasonable doubt; specifically, he contends that the evidence indicated that the owners of the dealership were "thieves," their records were "a mess," the regular daily records did not show discrepancies, and the State did not show that he had exclusive control of the missing money. He further asserts that the allegation that he "admitted the crime was not proven beyond a reasonable doubt."

In determining whether a defendant was proved guilty beyond a reasonable doubt, the relevant question is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453; see *People v. Hooper* (1989), 133 Ill. 2d 469, 552 N.E.2d 684.) Where the State's evidence is improbable, unconvincing and contrary to human experience, judgments of conviction should be reversed. (*People v. Gordon* (1990), 204 Ill. App. 3d 123, 126, 561 N.E.2d 1164.) A person commits theft when he knowingly obtains or exerts unauthorized control over property of the owner. Ill. Rev. Stat. 1989, ch. 38, par. 16—1(a)(1).

In the instant case, defendant asserts that he was not proved guilty of theft beyond a reasonable doubt where the evidence showed that the money allegedly stolen from the dealership had "passed through" several other employees. He further argues that the evidence indicated that the owners of the dealership routinely practiced "illegal conversion of cash and receipts." Thus, defendant argues that the evidence did not prove that it was he who stole the money; rather, he maintains that the evidence showed that anyone in the dealership could have taken the money, especially Sondag, whom defendant characterizes as a "thief."

■ Defendant is correct in his contention that the evidence indicates that the money in the deal jackets was available to a number of employees at the dealership; however, the record reflects that the delivery manager, not any other employee, collected payments from customers and controlled the influx of money into the dealership. Furthermore, the testimony from several customers indicating that defendant took their money but failed to give them a receipt would tend to contradict defendant's and Gladys Brooks' testi-

mony that Sondag's taking receipts out of deal jackets was the reason that customers would not receive receipts. Likewise, defendant's testimony that during busy times it was standard procedure not to give customers receipts is directly contradicted by the several customers' testimony that they did not receive a receipt from defendant on the same day that they had received receipts from salespersons for their down payments. That those customers' money taken by defendant for which he failed to tender receipts was later discovered missing does indeed implicate defendant in the theft.

Most important, however, was Sondag's testimony that, when confronted, defendant confessed to the theft and offered to begin repayment with his $4,000 check. That the court chose to accept Sondag's version of the confrontation rather than defendant's was within its discretion; it is the function of the trier of fact to determine the credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. (*People v. Byron* (1987), 116 Ill. 2d 81, 506 N.E.2d 1247.) It certainly follows from the evidence that the court would doubt defendant's story, particularly where defendant, on cross-examination, acknowledged that he told Clayton Sondag, Kussman and Sondag, when asked how much money he had stolen, that he did not know. Moreover, the court's assessment, that "people who last about 20 years in the automobile business are not weak, jellyfish kind of people" and would not likely hand over a "very hard earned" $4,000 paycheck, also refutes defendant's version.

Defendant incorrectly asserts that the State did not prove "beyond a reasonable doubt" that he confessed during the confrontation; the State need prove only the elements of the offense beyond a reasonable doubt. An admission is not one of the elements of theft.

In the case *sub judice*, the court found that defendant's act of signing over his $4,000 paycheck "together with his extremely damaging admissions in that confrontation taken with all the other evidence in the case convinced [it] beyond a reasonable doubt that the defendant is guilty" of theft. The circuit court was made well aware of the considerable allegations against Sondag and his and the dealership owners' alleged illegal activity; the court, however, chose not to believe defendant's story that he was a "fall guy." Because the circuit court heard all the evidence and was better able to judge the credibility of the witnesses, we will not substitute our judgment for that of the circuit court, particularly where the court's determination was supported by the evidence.

## II

Defendant next contends that the circuit court erred in admitting Sondag's "spread sheet" into evidence; specifically, he maintains that the spread sheet was not a business record, was based on unproduced data, was prepared during an investigation, and contained errors. The State initially responds that defendant has waived review of this issue by failing to raise it in his post-trial motion; assuming *arguendo* that the issue is not waived, the State asserts that the court properly admitted the spread sheet as a summary of voluminous material.

In so arguing, the State asserts that the spread sheet was merely a "summary" of voluminous documents; specifically, the State maintains that all the documents contained in the deal jackets were summarized in the spread sheet and, thus, the spread sheet was properly admitted. For support, the State relies upon several cases, all civil, holding that the admission of exhibits into evidence which contain a summary of voluminous original documents is proper. See *Landmark Structures, Inc. v. F.E. Holmes & Sons Construction Co.* (1990), 195 Ill. App. 3d 1036, 1051, 552 N.E.2d 1336; *In re Marriage of Kaplan* (1986), 149 Ill. App. 3d 23, 30, 500 N.E.2d 612; *Kohutko v. Four Columns, Ltd.* (1986), 148 Ill. App. 3d 181, 188, 498 N.E.2d 522.

Those cases allow the circuit court, in its discretion, to admit into evidence exhibits containing summaries when the original documents upon which the summaries are based are voluminous and cannot conveniently be examined by the trier of fact. (*Landmark Structures, Inc. v. F.E. Holmes & Sons Construction Co.*, 195 Ill. App. 3d at 1051.) The documents which are summarized, however, must be made available in court or made available to the opposing party. *Landmark Structures, Inc. v. F.E. Holmes & Sons Construction Co.*, 195 Ill. App. 3d at 1051.

Defendant argues that the spread sheet was not kept in the regular course of business because it was prepared during an investigation and in anticipation of litigation. Defendant, however, misconstrues the "regularly conducted business activity" requirement. Section 115—5 of the Code of Criminal Procedure of 1963 makes admissible as evidence any record made in the regular course of any business "if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter." (Ill. Rev. Stat. 1989, ch. 38, par. 115—5(a).) In contrast, "[n]o writing or

record made in the regular course of any business shall become admissible as evidence \*\*\* if \*\*\* [s]uch writing or record has been made by anyone during an investigation of an alleged offense or during an investigation relating to pending or anticipated litigation of any kind." (Ill. Rev. Stat. 1989, ch. 38, par. 115—5(c)(2).) Neither section 115—5(a) nor 115—5(c), however, requires that a *summary* of data be kept in the regular course of business; rather, it is the underlying data upon which the summary is based that must be so kept. Once the underlying data are admissible under the business records exception, a summary of that data can be admitted, permitting a party to present a summary of the voluminous documents where the contents of voluminous writings cannot conveniently be examined in court.[1]

◼ The basis for the evidentiary use of summaries at trial is Federal Rule of Evidence 1006, which provides:

> "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court." (Fed. R. Evid. 1006.)

In the Federal courts, both Rule 1006 and "the established tradition" allow the introduction of summary evidence to aid the fact finder in the examination of testimony or documents in evidence. (*United States v. Loney* (5th Cir. 1992), 959 F.2d 1332, 1341; *United States v. Paulino* (6th Cir. 1991), 935 F.2d 739, 753.) Rule 1006 thus "removes the Best Evidence Doctrine as an impediment to proving the content of voluminous written, recorded, or photographic material by means of a 'chart, summary, or calculation' when the under-

---

[1]Defendant inappropriately relies upon *People v. Holowko* (1984), 124 Ill. App. 3d 426, 464 N.E.2d 813 (holding that a computer record generated from a telephone trap requested by the police was prepared during an investigation and thus inadmissible), later reversed by the supreme court in *People v. Holowko* (1985), 109 Ill. 2d 187, 486 N.E.2d 877 (holding that section 115—5(c)(1), restricting admission of business records prepared during investigation, was inapplicable to records made by a machine having no capacity to intentionally falsify information), and *People v. Casey* (1992), 225 Ill. App. 3d 82, 587 N.E.2d 511 (holding that an exhibit prepared during an investigation of theft was inadmissible) in support of his position that the spread sheet was inadmissible. Neither *Casey* nor *Holowko* addressed whether the documents were summaries based upon admissible evidence; rather, both cases confined their analyses to the issue of whether the documents were prepared during investigations.

lying material 'cannot conveniently be examined in court.' " (*United States v. Ashford* (7th Cir. 1991), 924 F.2d 1416, 1422, quoting Fed. R. Evid. 1006.) The purpose then of Rule 1006 is to provide a practicable means of summarizing voluminous information. (Fed. R. Evid. 1006 Advisory Committee's Notes.) The language of the rule, though, does not require that the original voluminous material be introduced into evidence; rather, it merely requires that the summarized material be made available to the opposing party. *United States v. Bakker* (4th Cir. 1991), 925 F.2d 728, 736.

The Federal courts have distinguished between those summaries which condense voluminous materials not admitted at trial and pedagogical summaries of testimony or documents already admitted into evidence. (*United States v. Winn* (5th Cir. 1991), 948 F.2d 145, 158-59; *United States v. Wood* (9th Cir. 1991), 943 F.2d 1048, 1053.) Those courts have long held that such pedagogical devices should be used only as a testimonial aid and should not be admitted into evidence or otherwise be used by the jury during deliberations. (*United States v. Wood*, 943 F.2d at 1053.) Nevertheless, it is within the trial court's discretion to admit summary evidence even of documents admitted at trial where the review of those documents would be inconvenient; the fact that reports or documents are already in evidence does not mean that in-court examination would be necessarily convenient. (*United States v. Winn*, 948 F.2d at 158-59; *United States v. Osum* (5th Cir. 1991), 943 F.2d 1394, 1405.) Implicit in Rule 1006 is the notion that the trial court may, in the circumstances of a given case, determine that the jury, or the court in a bench trial, ought to consider the source documents in resolving a fact issue and that, on balance, a summarization of such evidence would not add to or detract from the proper weight or emphasis to be given such source documents.

■ Because, in the instant case, the data contained in one deal jacket must be perforce compared to the data in the others, we find that the evidence presented by the State was voluminous and clearly incapable of being conveniently examined in court. We thus find that an analysis pursuant to Rule 1006 is appropriately applied in the instant case and, furthermore, adopt the reasoning of the Federal courts relating to Rule 1006.

In the case *sub judice*, Sondag testified that he prepared the spread sheet after he determined that the computer listing did not reflect payments made by several customers. Defense counsel continued to object to the use or admission of the spread sheet, arguing that it was not an original and arguing that he had seen only the deal jackets but not any

ledgers, books or journals from the dealership. The court, after determining that the spread sheet was prepared using documents from the deal jackets and information from the customers themselves, found that the State had established a foundation "of where the numbers are from on the spread sheet." The court further stated, however, that additional evidence had to be forthcoming "in terms of the truth and accuracy of what the customers are saying regarding these figures."

Although Rule 1006 requires the party seeking to summarize the contents of voluminous records to make those records available for examination by other parties, defense counsel here explicitly stated that he had reviewed the deal jackets which were provided by the State. Thus, he cannot now assert that he was not provided the documents serving as a basis for the spread sheet. Likewise, defendant had full opportunity to cross-examine Sondag and thereby had an opportunity to demonstrate to the trier of fact any erroneous calculations in the spread sheet. While we recognize the powerful impression which charts and summaries can make upon a jury, vesting a summary with an air of credibility independent of the evidence purported to be summarized, the court in the instant case, as trier of fact, was cognizant of defendant's allegations against Sondag and was thus better able to weigh the importance of the spread sheet. Furthermore, the introduced deal jackets underlying the spread sheet, though not made of record in this appeal, apparently were sufficient to support the calculations in the spread sheet.

Though we are unable, based on their absence from the record, to determine the contents of the deal jackets, from the testimony at trial, we find that the spread sheet was substantially consistent with the evidence adduced at trial. The spread sheet consisted of 10 headings: customer name, car, date, price of the car, deposit paid, deposit received, COD paid, COD received, "cover up," and "stolen." The last two headings delineated the funds that had been applied to other customers' accounts and the funds that could not be accounted for, respectively.[2] According to Sondag, after speaking with the customers and ascertaining who had paid the dealership in full, he prepared his spread sheet with

---

[2]We emphasize that, because summaries are admissible as evidence under both Federal Rule of Evidence 1006 and in Illinois, care must be taken to omit argumentative and conclusional matter in their preparation lest a jury be misled. As for the "cover up" and "stolen" headings in the instant case, they accurately explained the significance that Sondag attached to those dollar amounts; in this sense, the headings reflected certain assumptions on Sondag's part, but these assumptions were amply supported by the evidence already before the court. Moreover, we do not find that the characterization in the headings prejudiced defendant or unduly influenced the court.

the information contained in the deal jackets and the information contained in the computer listing. It follows that the deal jackets and the computer listing provided the data to determine the customer name, car, price, and the funds received from the customers—those would necessarily be contained in the deal jackets. Sondag would, however, have to rely upon the customer's assertion of payment in order to determine the "COD paid" amount (if missing), unless the customer's check was misapplied to, and thereby corroborated by, another account. This leads to the problematic conclusion that, in preparing his spread sheet, Sondag relied in part on his "interviews" or discussions with the customers.

■ Because a summary of voluminous evidence is admissible only if the underlying materials upon which the summary is based are admissible, we find that the spread sheet in the instant case suffers from the taint of inadmissible hearsay. Notwithstanding the admissibility of the deal jackets and the computer listing, as prepared in the ordinary course of business, the spread sheet was, in part, based upon the out-of-court statements of the customers telling Sondag that they had already paid in full. Thus, Sondag's spread sheet and his conclusions therein were based in part on information not admissible during trial. We recognize that the State provided the testimony of several customers whose payments allegedly were stolen by defendant; however, the spread sheet also contained listings of customers whose payments were allegedly misappropriated and whose testimony the State did not provide. The accuracy of the summary as to those customers was therefore dependent upon Sondag's testimony.

Notwithstanding the inadmissibility of the underlying basis of part of the spread sheet, we find that the circuit court considered it in its proper context and defendant was thus not prejudiced by its introduction. The court, here, recognized the requisite laying of a proper foundation "of where the numbers are from on the spread sheet," and thus correctly perceived the nature of the spread sheet as summary evidence. Absent the introduction of the spread sheet, moreover, the evidence presented in the instant case supports defendant's conviction. Though defendant characterizes the spread sheet as the State's "key evidence of the missing funds," the court relied primarily upon defendant's admission to Clayton Sondag, Kussman, and Sondag. Further, the State introduced, and the court admitted into evidence, the dealership's deal jackets for the 20 customers who were victims of defendant's lapping scheme. Thus, though part of the spread sheet was arguably improperly admitted into evidence, defendant's conviction did not rest solely upon that piece of evidence, but was amply supported by the other evidence admitted at trial.

## III

Defendant next contends that he was denied his sixth amendment right to call witnesses in his own behalf when the circuit court permitted a witness to invoke his fifth amendment right to silence. The State responds that the court correctly held that the witness provided a valid basis to assert his fifth amendment right.

The right of a defendant to call witnesses in his own behalf is fundamental and essential to due process. (*People v. Moore* (1990), 199 Ill. App. 3d 747, 767, 557 N.E.2d 537; *People v. Echols* (1986), 146 Ill. App. 3d 965, 972, 497 N.E.2d 321.) Nonetheless, a defendant's right to call witnesses does not include the right to compel a witness to waive his fifth amendment privilege to remain silent. (*Bradford v. Soto* (1987), 159 Ill. App. 3d 668, 673-74, 512 N.E.2d 765; see also *People v. Katsigiannis* (1988), 171 Ill. App. 3d 1090, 1101, 526 N.E.2d 508.) The right against self-incrimination, however, may be exercised only where the witness has reasonable cause to fear the possibility of subsequent prosecution from a direct answer. (*People v. Redd* (1990), 135 Ill. 2d 252, 304, 553 N.E.2d 316; *People v. Cooper* (1990), 202 Ill. App. 3d 336, 341, 559 N.E.2d 942.) Neither an unreasonable fear of self-incrimination nor a mere reluctance to testify is grounds for claiming the privilege. (*Cooper*, 202 Ill. App. 3d at 341.) The mere "say-so" of a witness does not in and of itself establish the privilege; it is for the circuit court to determine if under the particular facts there is a real danger of incrimination. *Cooper*, 202 Ill. App. 3d at 341.

In the instant case, after James Kussman invoked his fifth amendment right, the court held an *in camera* proceeding where Kussman's attorney informed the court that Kussman, pursuant to a Federal grant of immunity, was cooperating in an investigation of Clayton Sondag and the Sondag-owned dealerships. According to Kussman's attorney, Clayton Sondag and Kussman underreported Castle Oldsmobile's (another Sondag-owned dealership) income for several years. Prior to 1984, Clayton Sondag had developed a practice in which he would take checks that had been received by Castle Oldsmobile and give those checks to the bookkeeper in exchange for cash. In July 1984, Kussman joined Clayton Sondag in his attempts to underreport Castle Oldsmobile's and their own incomes. Shortly thereafter, in July 1984, when defendant admitted stealing the money and endorsed his paycheck over to the dealership, Clayton Sondag kept the check and, in accordance with his check-cashing procedure, had the check cashed at Castle Oldsmobile. He gave half to Kussman,

keeping the other half for himself; thus, the proceeds of the check were not reported in the dealership's books.

Following Kussman's proffer, the court determined that valid grounds for the fifth amendment privilege had been shown. The court then allowed defendant an opportunity to make an offer of proof as to the testimony that would be elicited by Kussman. Defense counsel then stated that he would attempt to show that at various times the owners of the dealerships sued each other in the circuit court of Cook County over the monetary affairs of the dealerships. Defense counsel stated that he would further show that the exact amount of money missing from the dealership could not be shown because of the sloppy bookkeeping. Counsel averred that Kussman's testimony would show that Sondag had an "extensive narcotic habit" and that others at the dealership had misappropriated the funds. Following defendant's offer of proof, the court excused Kussman from testifying.

Defendant argues that the circuit court erred by recognizing "Kussman's blanket fifth amendment privilege"; however, the court did not recognize a "blanket" privilege, but rather recognized Kussman's specific right not to implicate himself in any illegal activities at the dealership. Despite defendant's contention that he should have been allowed to elicit testimony from Kussman concerning financial crimes committed by the owners of the dealership, had Kussman testified to those "financial crimes" he would have incriminated himself. Moreover, no narrower privilege would have protected Kussman; defendant himself asserts that he would have asked Kussman about the confrontation and the $4,000 check, which Kussman and Clayton Sondag later misappropriated.

Based upon the contents of the *in camera* proceeding, we find that the circuit court did not err in allowing Kussman to exercise his fifth amendment privilege. Kussman's privilege extended not only to answers that would in themselves support a conviction but also to answers that might furnish a link in a chain of evidence needed to prosecute him for a crime. (*Cooper*, 202 Ill. App. 3d at 341.) Accordingly, we find that defendant was not denied his right to call witnesses in his own behalf.

IV

Defendant lastly contends that the circuit court erred in sentencing him to three years' imprisonment and ordering restitution; specifically, defendant maintains that the evidence did not establish that he stole $29,989.14; that the court failed to set off the restitution amount by the $4,000 that defendant had paid; that the State misrepresented

factors in aggravation; and that the court failed to give adequate emphasis to substantial mitigation.

Sentencing is a matter of judicial discretion and, absent an abuse of that discretion, the sentence may not be altered on review. (*People v. O'Neal* (1988), 125 Ill. 2d 291, 297-98, 531 N.E.2d 366.) Correspondingly, the circuit court can determine if restitution, in conjunction with a term of imprisonment, is an appropriate sentence. See *People v. Wagner* (1989), 189 Ill. App. 3d 1041, 1055, 546 N.E.2d 283; *People v. Jones* (1986), 145 Ill. App. 3d 835, 839, 495 N.E.2d 1371.

During the sentencing hearing in the instant case, the circuit court heard evidence in aggravation and mitigation, including evidence of a pending indictment against defendant for theft from King Nissan. Defense counsel requested probation and community service and also presented the court with three different proposals for repayment of $29,000.

■ The State asserts that because defendant invited and promoted restitution as a sentence, this court should find that he has waived any objections to the court's sentence. (See *People v. Early* (1987), 158 Ill. App. 3d 232, 240-41, 511 N.E.2d 847 (where a defendant invites a trial court to order restitution, he may be precluded from arguing that the court erred); *People v. Eades* (1984), 123 Ill. App. 3d 113, 118-19, 462 N.E.2d 819 (defendant waived any error in sentencing when he requested restitution as part of his sentence).) The record is unclear, however, whether defendant himself invited or requested restitution. During the sentencing hearing, defense counsel presented the court with three alternative payment schedules, stating "the court had asked me to put together a schedule. I have put together *** three alternative methods of payment for the court to consider." At most, we find that the record indicates discussions between the court and defense counsel; contrary to the State's assertion, we do not find that defendant himself promoted restitution.

■ Defendant's further assertion, however, that the State erroneously argued that defendant was in a position of "trust" must fail. The prosecutor, in stating that defendant was in a position of public trust, merely argued that defendant's crime was serious in that he abused his relationships with his customers in order to defraud his employer; the State in no manner maintained that the court consider defendant's position of "public trust" as an aggravating factor.

■ Nevertheless, we find that defendant's additional assertion that the court erred in failing to apply the $4,000 payment to the restitution order has merit. During the sentencing hearing, the court did not refer to defendant's $4,000 payment in determining the amount of

restitution. Furthermore, though the evidence at trial and in aggravation during the sentencing hearing reflected losses due to theft in excess of $40,000, the court ordered restitution only for the amount charged in the indictment. Although the State contends that the court's sentence was proper where the evidence showed that defendant proximately caused losses in excess of the amount alleged in the indictment, we find that, because the record reflects that the court neglected to consider the $4,000 already paid by defendant, the amount of restitution must be reduced by that amount defendant has already paid towards the losses incurred by the dealership. See also *Early*, 158 Ill. App. 3d at 241.

Based on the foregoing, the judgment of the circuit court of Cook County finding defendant guilty of theft is affirmed. Defendant's sentence, however, is reversed and remanded to the circuit court with directions to reduce the amount of restitution by $4,000.

Affirmed in part and reversed in part and remanded.

HARTMAN, P.J., and SCARIANO, J., concur.