2023 IL App (1st) 221055-U

No. 1-22-1055

Order filed November 22, 2023

FIFTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 12799 |
| | ) | |
| VOLODYMYR DRAGAN, | ) | Honorable |
| | ) | Joseph Michael Cataldo, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Mitchell and Justice Mikva concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the judgment of the circuit court over defendant's contentions that the State did not to prove him guilty beyond a reasonable doubt, that the State deprived him of his right to fair trial, that the trial court erred in imposing a firearm enhancement to his sentence, and that his conviction for aggravated assault violated the one-act, one crime rule. We vacate, however, defendant's conviction for aggravated battery under the one-act, one-crime rule.

¶ 2    Following a jury trial, defendant Volodymyr Dragan was found guilty of attempted murder

of a peace officer, aggravated battery, aggravated unlawful restraint, and aggravated assault, then

sentenced to an aggregate term of 57 years' imprisonment. The charges stemmed from two separate incidents with Illinois State Police (ISP) troopers that took place on August 15, 2019. First, Mr. Dragan, who was driving a motorcycle at a high rate of speed, was stopped by ISP Trooper Eric Manheim. During the stop, Trooper Manheim placed Mr. Dragan in the back seat of his squad car. Mr. Dragan displayed a gun to Trooper Manheim and eventually forced Trooper Manheim to let him exit the vehicle. Later that day, an ISP special weapons and tactics (SWAT) team performed a raid at Mr. Dragan's residence. During the raid, Mr. Dragan shot ISP Trooper Joshua Meyer in the arm. Mr. Dragan eventually surrendered and was taken into custody.

¶ 3 On appeal, Mr. Dragan asserts that the State failed to prove him guilty of attempted first degree murder because they failed to establish that he had the specific intent to kill. Mr. Dragan maintains that the evidence shows that he was motivated by "suicidal despair" in his confrontations with the troopers. Mr. Dragan also contends that the State misstated the law during closing argument when the assistant state's attorney (ASA) stated that Mr. Dragan's mere act of firing a gun demonstrated his intent to kill. Mr. Dragan further asserts that the trial court erred by adding the 25-year firearm enhancement to his sentence where the enhancement was not applicable because the victim was a peace officer. Finally, Mr. Dragan contends that his convictions for aggravated battery with a firearm and aggravated assault should be vacated under the one-act, one crime rule. For the reasons that follow, we vacate Mr. Dragan's conviction for aggravated battery, and we affirm the judgment of the circuit court in all other respects.

¶ 4 I. BACKGROUND

¶ 5 Mr. Dragan was charged by indictment with 15 offenses stemming from the incidents on August 15, 2019. The State ultimately proceeded to trial on four charges: attempted first degree

murder of Trooper Meyer, a peace officer in the course of performing his official duties; aggravated battery of Trooper Meyer; aggravated unlawful restraint of Trooper Manheim; and aggravated assault of Trooper Manheim. The State further alleged that during the commission of the attempted murder, Mr. Dragan personally discharged a firearm that proximately caused Trooper Meyer great bodily harm.[1]

¶ 6     At trial, Trooper Manheim testified that in the early morning hours of August 15, 2019, he was on patrol on Interstate 294 when he observed a motorcycle travelling at a high rate of speed. Trooper Manheim conducted a traffic stop of the motorcycle and identified Mr. Dragan as the driver. During the traffic stop, Trooper Manheim learned that Mr. Dragan had an active warrant for his arrest. Trooper Manheim asked Mr. Dragan to leave the motorcycle and join him in his squad car. Trooper Manheim testified that he would normally handcuff the person in this situation, but he did not place handcuffs on Mr. Dragan because he had a "lapse in judgment." Trooper Manheim also did not search Mr. Dragan's person to determine whether he had any weapons before he entered the squad car.

¶ 7     Mr. Dragan sat in the rear passenger seat of the squad car and Trooper Manheim sat in the driver's seat. The rear seats were separated from the front seats by a plexiglass barrier with an opening in the center. Trooper Manheim could only see Mr. Dragan from the shoulders up through the barrier. While Trooper Manheim was communicating with dispatch to confirm the warrant, Trooper Eison[2] arrived to provide backup. Dispatch confirmed the warrant for Mr. Dragan and

---

[1]Trooper Meyer did not testify at Mr. Dragan's trial because he was on deployment for the National Guard. He did submit a victim impact statement which was read on his behalf at the sentencing hearing.

[2]Trooper Eison's first name does not appear in the record filed on appeal.

also alerted Trooper Manheim that Mr. Dragan had a concealed carry license, but Trooper Manheim did not ask Mr. Dragan whether he was carrying a gun. Trooper Manheim learned that the warrant was for contempt of court in a civil matter and that there was no bond.

¶ 8      After Mr. Dragan heard the information about the warrant, he told Trooper Manheim that he wanted to go home and that Trooper Manheim should let him go. Mr. Dragan stated that it was "impossible" for him to go to jail. Trooper Manheim became concerned because he did not know what Mr. Dragan meant. Mr. Dragan attempted to open the rear door, but Trooper Manheim explained to him that the rear doors could only be opened from the outside. Trooper Manheim started to exit the vehicle, but Mr. Dragan told him not to move. Trooper Manheim stayed in the vehicle and talked with Mr. Dragan in an attempt to deescalate the situation. Mr. Dragan said that he did not want to hurt anyone and wanted to go home so that he could "live out his last day."

¶ 9      Trooper Manheim told Mr. Dragan to keep his hands where he could see them and Mr. Dragan told Trooper Manheim to do the same. Trooper Eison then approached the vehicle and Mr. Dragan lowered his hands to where Trooper Manheim could not see them. Mr. Dragan then made a "quick *** upward movement," and Trooper Manheim saw that Mr. Dragan was holding a black handgun or pistol. Trooper Manheim heard Mr. Dragan "rack[]" the gun, which loaded a bullet into the chamber. Trooper Manheim acknowledged that on the recording from his vehicle's rear camera, Mr. Dragan's finger did not go into the trigger well, but Trooper Manheim could not see that from where he was sitting. Trooper Manheim also acknowledged that Mr. Dragan did not point the gun at him, and at one point was holding the gun by the barrel rather than the handle.

¶ 10      Mr. Dragan repeated that he just wanted to go home and Trooper Manheim responded that Mr. Dragan had to get rid of the firearm. Mr. Dragan complied by taking the magazine out of the

magazine well, but he refused to remove the bullet from the chamber. Mr. Dragan stated that the bullet in the chamber was for himself or for "whomever." At that point, Trooper Manheim rolled down the rear passenger window so that Mr. Dragan could reach outside of the vehicle and open the rear door. Mr. Dragan returned to his motorcycle, then turned around and came back to the squad car to retrieve his driver's license. He then went back to his motorcycle and drove away. Trooper Manheim did not see Mr. Dragan holding the gun after he initially saw it when Mr. Dragan racked the gun to put a bullet in the chamber.

¶ 11    Master Sergeant Andrew Ramaker testified that he was a member of the SWAT team for the Illinois State Police. On the date of the incident, his team received an assignment to assist in serving a high risk search warrant at Mr. Dragan's townhouse. Sergeant Ramaker and his team coordinated at the Wheeling, Illinois police department with other members of the ISP. Sergeant Ramaker estimated that 20 officers were involved in the operation, including ISP Trooper Thomas Sheehan. The officers formulated a plan to use the "call out" technique whereby officers would surround the house and order any occupants to exit the building.

¶ 12    When they arrived at the indicated address, one team went to the rear of the residence while Sergeant Ramaker and Trooper Sheehan were with another team at the front of the residence inside an armored vehicle. Trooper Meyer was one of the members of the team that approached the rear of the residence. The armored vehicle approached as close to the front door of the residence as possible and the team used the vehicle's audio system to make an announcement requesting anyone inside the residence to exit so that they could be taken into custody. The announcement was made more than three times, but there was no response from inside the residence.

¶ 13    Sergeant Ramaker made the decision to use the ram attached to the armored vehicle to "push" the front door. After they propped the door open, Sergeant Ramaker heard a gunshot come from the first floor of the residence. Sergeant Ramaker observed a "puff of smoke" that came from the end of a firearm inside the residence and saw a bullet deflect off of the window of the armored vehicle. Trooper Sheehan testified that he heard "at least two" gunshots. Neither Sergeant Ramaker nor Trooper Sheehan saw the gun the shots were fired from or the person who fired the gun.

¶ 14    Sergeant Ramaker then contacted the team at the rear of the residence to let them know that a shot had been fired. Shortly thereafter, Sergeant Ramaker learned that Trooper Meyer had been shot at the rear of the residence. Sergeant Ramaker decided to use the ram on the armored vehicle to remove as much of the front of the residence as possible so that the officers could see inside. While doing so, the officers continued making announcements that anyone inside the residence should come out with their hands up.

¶ 15    Eventually, Sergeant Ramaker saw a person standing near the front of the house with a pistol in his waistband. Trooper Sheehan ordered the person out of the house where he was taken into custody. Both Sergeant Ramaker and Trooper Sheehan identified the person as Mr. Dragan. Mr. Dragan told Trooper Sheehan that no one else was in the house and the pistol was in the basement. Trooper Sheehan recovered a pistol from the basement of the townhouse.

¶ 16    Trooper Anthony Andreoni testified that he was a member of the rear SWAT team assigned to breach the sliding glass door. As the team was getting ready to move into position to breach the door, Trooper Andreoni heard a gunshot fired from inside near the front of the townhouse. The team took cover behind some trees. About a minute later, Trooper Andreoni heard a second gunshot. After the second gunshot, he heard Trooper Meyer yell that he had been "hit." Trooper

Andreoni was not able to tell where the second gunshot had come from. Trooper Andreoni yelled for Trooper Meyer to get out of there and the team fell back to a concealed location. Once the team retreated, Trooper Andreoni saw that Trooper Meyer had been shot in the right arm and Trooper Andreoni applied a tourniquet to the wound. Trooper Andreoni helped Trooper Meyer to the ambulance and then accompanied him to hospital where hospital staff treated his gunshot wound.

¶ 17    The State then presented forensic evidence showing that Mr. Dragan had discharged a firearm, contacted a primer gunshot residue, or had both hands in the vicinity of a discharged firearm. The State presented evidence that the bullet that struck Trooper Meyer went through the outside of arm, came out on the inside, near his armpit, and struck a firearm magazine that was attached to his bulletproof vest.

¶ 18    Mr. Dragan testified on his own behalf that he and his wife moved to the United States from Ukraine in 2007. They divorced in 2010, and Mr. Dragan married his second wife in 2015. He divorced his second wife in 2018. Mr. Dragan testified that he was happy while he was with his second wife, but after the divorce he became upset and stopped talking to his friends and family. Mr. Dragan left his job as an engineer because he was depressed and thought "[t]here was no reason to live." Shortly thereafter, Mr. Dragan obtained a firearm owners identification card and bought a gun. Mr. Dragan attempted to commit suicide using the gun, but he found himself unable to pull the trigger. Mr. Dragan also tried to kill himself by not eating and by riding his motorcycle without a helmet.

¶ 19    With regard to the incident on August 15, 2019, Mr. Dragan testified that he took out his gun in Trooper Manheim's squad car because he wanted Trooper Manheim to know that he was "serious"; "I mean that I will not be able to walk from their car alive." He testified that he never

pointed the gun at Trooper Manheim or Trooper Eison and did not want to shoot them. Mr. Dragan testified that when he told Trooper Manheim that it was "impossible" for him to go to jail, he meant that he knew that if he went to jail he would not be able to commit suicide because the correction officers would be watching him. Mr. Dragan testified that he only wanted to kill himself and did not want to hurt anyone else. He did not want to tell Trooper Manheim that he was suicidal because he did not think he would let him go. He testified that he was "play[ing] [a] little bit" when he told Trooper Manheim that the bullet in the chamber of his gun was for himself or for "whomever."

¶ 20    After Mr. Dragan retrieved his driver's license from Trooper Manheim, he drove his motorcycle straight home. Mr. Dragan knew that the police were coming, but did not do anything to prepare for their arrival and instead tried to sleep. Mr. Dragan was awoken that evening by troopers outside of his house. Mr. Dragan did not hear any commands being issued, but saw an armored vehicle outside. Mr. Dragan ran to his basement because he wanted to "buy some time." Mr. Dragan explained that he still planned to commit suicide, but needed time to work up the nerve to do so. He testified that the basement was the "safest" location in his house.

¶ 21    Mr. Dragan testified that he did not intend to shoot any of the troopers, but when he heard the armored vehicle breach the door to his townhouse, he fired one shot into the basement ceiling in the direction of the front door to slow the troopers down because he was not yet ready to commit suicide. Mr. Dragan testified that he was not trying to shoot any of the troopers and did not hear anyone moving around upstairs. He then fired three more shots in the same vicinity so that the troopers would not think that he killed himself.

¶ 22    Mr. Dragan then moved to the rear window where he saw two troopers standing outside. Mr. Dragan believed that the troopers were being "stupid" because they put themselves in a position to be shot after he already fired four shots. Mr. Dragan could see into the backyard of his townhouse from the basement because the plastic covering over the window well was propped open by about four inches. Mr. Dragan acknowledged that the troopers did not see him through the window. He aimed his gun at one of the troopers' bulletproof vests and shot through the open window because he wanted to "teach [the troopers] a lesson." He did not intend to kill or harm the troopers when he shot at them, but he wanted them to return fire and kill him. Mr. Dragan realized he missed the trooper he was aiming for and hit the trooper standing behind him. After the troopers did not return fire, Mr. Dragan pointed the gun at himself again, but was unable to pull the trigger. Mr. Dragan then told the troopers that he was coming out and was surrendering. Mr. Dragan came out of the house with his hands up because he had given up on trying to commit suicide.

¶ 23    Following closing arguments, the jury found Mr. Dragan guilty on all four counts and found that Mr. Dragan personally discharged a firearm that proximately caused great bodily harm to another person. The defense filed a motion for a judgment notwithstanding the verdict or in the alternative a new trial, which was denied. Following the sentencing hearing, the trial court sentenced Mr. Dragan to 57 years imprisonment for the attempted murder of Trooper Meyer, which included a 25-year enhancement because Mr. Dragan personally discharged a firearm that proximately caused great bodily harm. The court also sentenced him to concurrent terms of 40 years for the aggravated battery of Trooper Meyer, 5 years for the aggravated unlawful restraint of Trooper Manheim, and 3 years for the aggravated assault of Trooper Manheim.

¶ 24 After Mr. Dragan's motion to reconsider sentence was denied, he filed a timely notice of appeal. We find that we have jurisdiction to consider the merits of this appeal pursuant to Illinois Supreme Court Rule 606 (eff. Mar. 12, 2021).

¶ 25                                  II. ANALYSIS

¶ 26 On appeal, Mr. Dragan contends that the State failed to prove beyond a reasonable doubt that he had the specific intent to kill Trooper Meyer. He further asserts that the State misled the jury by misstating the law on intent during its closing argument, thus depriving him of a fair trial. He also argues that the trial court erred in imposing the 25-year sentencing enhancement because the enhancement does not apply where the victim of the attempted murder is a peace officer. Finally, he contends that his convictions for aggravated battery with a firearm and aggravated assault should be vacated under the one-act, one-crime rule.

¶ 27                                  A. Intent to Kill

¶ 28 Mr. Dragan first contends that the State failed to prove beyond a reasonable doubt that he had the specific intent to kill Trooper Meyer when he shot him through the basement window. He maintains that the evidence presented showed that his intention was not to kill or harm anyone, but was to provoke return fire from the troopers and commit "suicide by cop." Mr. Dragan points out that based on the circumstances, he could have fired multiple times at the troopers, but instead chose to fire only a single shot. He asserts that his testimony about his suicidal ideations beginning before the traffic stop supports his contention that his goal was not to harm anyone, but was to commit suicide.

¶ 29 When a defendant challenges the sufficiency of the evidence to sustain his conviction, the reviewing court must consider whether, after viewing the evidence in a light most favorable to the

State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). This standard recognizes the responsibility of the trier of fact to determine the credibility of the witnesses and the weight to be given their testimony, to resolve any conflicts and inconsistencies in the evidence, and to draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). A reviewing court must allow all reasonable inferences from the record in favor of the State, and will not overturn the decision of the trier of fact unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011); *People v. Smith*, 185 Ill. 2d 532, 542 (1999).

¶ 30     A person commits the offense of attempted first degree murder when, with intent to commit murder, he or she does any act that constitutes a substantial step toward the commission of that offense. 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2018). The specific intent to kill is an essential element of the crime of attempted murder. *People v. Gentry*, 157 Ill. App. 3d 899, 902 (1987) (citing *People v. Bryant*, 123 Ill. App. 3d 266 (1984)). "Knowledge that the consequences of an accused's act may result in death (or grave bodily injury), or intent to do bodily harm, is not enough; specific intent to kill is required." *People v. Jones*, 81 Ill. 2d 1, 8-9 (1979) (citing *People v. Trinkle*, 68 Ill. 2d 198, 201-04 (1977)). Intent can be established by circumstantial evidence, such as the character of the assault, the use of a deadly weapon, and "other matters of which an intent to kill may be inferred." *People v. Mitchell*, 209 Ill. App. 3d 562, 569 (1991). "The very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill." *Id.* (citing *People v. Thorns*, 62 Ill. App. 3d 1028 (1978)).

¶ 31     Here, Mr. Dragan contends that the evidence showed that he intended to shoot the troopers, but did not have the specific intent to kill. Mr. Dragan points out that he testified that he aimed for the trooper's bullet proof vest and only intended to cause him some pain, but not to kill or harm him. He maintains that the discharge of a firearm is not automatically equated with an intent to kill in every case.

¶ 32     Despite Mr. Dragan's arguments to the contrary, his intent to kill can be reasonably inferred from the gunshot he fired at the troopers and the surrounding circumstances. According to Mr. Dragan's own testimony, he took a covered position in the basement from which he could see the troopers, but they could not see him. He took considerable time setting up his shot and had to hold his body in an unusual position to accurately aim his gun. He testified he first aimed for the middle of the trooper's chest and then shifted his aim to the outside of the trooper's rib cage "at the very edge of the bullet proof jacket." Nonetheless, he missed the trooper that he testified he was aiming for and struck the trooper standing behind him despite testifying that he was a skilled marksman who had completed firearm training. Mr. Dragan testified that the troopers were standing only five feet away from him and that he could accurately fire his gun at targets 50 or 60 feet away. The evidence showed that if the bullet had not struck the magazine attached to Trooper Meyer's vest, it might have entered his chest after exiting through his arm. Importantly, the jury was not required to credit Mr. Dragan's testimony that he was attempting to strike the trooper's bulletproof vest. Without Mr. Dragan's self-serving testimony, the facts are that he took up a concealed position, carefully aimed his gun, and shot Trooper Meyer in the arm near the outside of his chest where he had no protection from the bullet proof vest. These facts make it feasible for the jury to conclude

that Mr. Dragan had the specific intent to kill. *People v. Ephraim*, 323 Ill. App. 3d 1097, 1111 (2001).

¶ 33    The jury also heard the "credible explanations" that Mr. Dragan advances in contending that he lacked the specific intent to kill. Mr. Dragan maintains that if he intended to kill the troopers, he could have easily done so by shooting them again. Mr. Dragan points out that he had a magazine with 18 or 19 bullets and the troopers did not seem to know where the gunshot had come from after the bullet struck Trooper Meyer. Mr. Dragan's own testimony, however, belies the assertion that he could have fired at the troopers at will. He testified that he shot through a "very, very narrow opening" and it was "not easy to shoot through that opening." He could only see about half of the troopers' bodies and the rest was obscured by trees. He testified that if the troopers had been standing five feet further back or five feet to the left, he would not have been able to see them. After he shot at them, he was confused because the troopers did not react. He stood in the window for about five more seconds before moving away.

¶ 34    Thus, Mr. Dragan, who testified that he could make a "very precise shot," missed his intended target because of the constraints of his position and struck a different trooper than he was supposedly aiming for. Mr. Dragan could hardly see the troopers through the "very, very" narrow opening in basement window and Trooper Andreoni testified that the team fell back to a concealed location after Trooper Meyer was shot. Moreover, this court has recognized that a single shot fired in the direction of an officer is sufficient to support a conviction for attempted murder. *People v. Brown*, 341 Ill. App. 3d 774, 781 (2003). Thus, the jury could reasonably find that Mr. Dragan had the intent to kill based on the single shot he fired. The fact that he may have changed his mind after firing the single shot and decided not to fire at the officers again is irrelevant. "Abandonment

of the intent to kill, once the elements of attempted murder are complete, is no defense to the crime." *People v. Mitchell*, 105 Ill. 2d 1, 10 (1984).

¶ 35     Further, Mr. Dragan's actions do not resemble those of a person who was attempting to provoke return fire from the troopers in an effort to commit "suicide by cop." Mr. Dragan testified that he ran to the basement when he heard the troopers outside because it was the "safest" location in his house. He first shot at the armored vehicle at the front of his house through the basement ceiling where there was no chance of provoking return fire. He testified that when he moved to the rear basement window, there was only a small opening through which he could see the troopers. He acknowledged that they could not see him and after he fired the single gunshot they did not appear to know where it came from. Rather than draw attention to himself, he moved away from the basement window after about five seconds. Mr. Dragan could have done any number of things to attract the troopers' attention if he wished for them to shoot him, but he did not. When he ultimately surrendered and exited the house, he left his gun behind, followed all of the troopers' instructions, and was taken into custody without resisting.

¶ 36     Finally, we find Mr. Dragan's reliance on *People v. Wagner*, 189 Ill. App. 3d 1041 (1989) unpersuasive. In *Wagner*, the defendant was found guilty of attempted murder and armed robbery. *Id.* at 1042. In finding the defendant guilty, the trial court stated: "So whether or not you really intended to kill him, I really don't know that. I can't find that that is what your true intent was, but there certainly can be no question but [*sic*] what you intended to do great bodily harm." *Id.* at 1045. In vacating the defendant's conviction, this court observed that an element of attempted murder is a specific intent to kill. *Id.* at 1046. The court noted the trial court judge specifically stated that he

could not find specific intent to kill, but instead found the defendant guilty on the ground that the defendant intended to cause great bodily harm to the victim. *Id.* at 1045-46.

¶ 37    Here, this is no indication that the trier of fact, in this case the jury, based its finding of guilt on the grounds that Mr. Dragan intended to cause great bodily harm to Trooper Meyer. As discussed, the very fact of firing a gun at a person, as Mr. Dragan did in this case, supports the jury's conclusion that Mr. Dragan acted with an intent to kill. *Mitchell*, 209 Ill. App. 3d at 569. Accordingly, we find that the jury's determination that Mr. Dragan committed the offense of attempted first degree murder and thus had the specific intent to kill was not so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *Beauchamp*, 241 Ill. 2d at 8.

¶ 38                                    B. Closing Argument

¶ 39    Mr. Dragan next contends that he was denied his right to fair trial where the ASA misstated the law during closing argument. During closing argument, the ASA argued that the State had proved beyond a reasonable doubt that Mr. Dragan intended to kill Trooper Meyer because he picked up a gun and fired it at the trooper's chest. Mr. Dragan maintains that argument was inaccurate and misleading because intent cannot be automatically inferred where a person fires a gun at another person. Mr. Dragan asserts that this improperly lessened the State's burden of proving intent beyond a reasonable doubt.

¶ 40    Mr. Dragan concedes that he failed to preserve this issue for review by failing to object at trial and failing to raise the issue in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186-87 (1988) (holding that in order to preserve an issue for review on appeal, the defendant must both object at trial and raise the issue in a posttrial motion). He maintains that we may nonetheless

review the issue under the plain error doctrine. "The plain-error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). The plain error doctrine:

> "permits a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Sargent*, 239 Ill. 2d 166, 189 (2010).

The first step of plain error review is to determine whether any error occurred, which requires a substantive review of the issue. *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009). If error is found, the court then proceeds to consider whether either of the two prongs of the plain error doctrine have been satisfied. *Sargent*, 239 Ill. 2d at 189-90. The defendant bears the burden of persuasion under both prongs. *Id.* at 190. Accordingly, we will first address whether the ASA's argument constituted error.

¶ 41     "Courts allow prosecutors great latitude in making closing arguments." *People v. Blue*, 189 Ill. 2d 99, 127 (2000) (citing *People v. Cisewski*, 118 Ill. 2d 163, 175 (1987)). During closing argument, the State may comment on the evidence and all reasonable inferences based on the evidence. *Id.* "Although the prosecutor's remarks may sometimes exceed the bounds of proper comment, the verdict must not be disturbed unless it can be said that the remarks resulted in substantial prejudice to the accused, such that absent those remarks the verdict would have been different." *People v. Pasch*, 152 Ill. 2d 133, 185 (1992).

¶ 42     In this case, during closing argument, the ASA stated:

"And let's not forget what the Defendant got on the stand and told you. He's a good shot. He's a precise shot. But he was aiming for the chest. And he did, in fact, hit the chest. That is very clear intent. Ladies and gentlemen, his intent despite what's going on with his own feelings about himself, his intent follows that bullet. When he picks up that gun and aims it at the Trooper's chest, that's intent. When he pulls the trigger, that's intent. And that intent follows the bullet out of the chamber, into Trooper Meyer's arm, out the other side, and into that magazine. We have absolutely beyond a reasonable doubt shown that he had the intent to kill Joshua Meyer."

Mr. Dragan maintains that this argument about intent lessened the State's burden of proof by telling the jury that his mere act of picking up and firing the gun was sufficient to prove intent to kill. As noted, however, during closing argument the State is permitted to comment on the evidence and *all reasonable inferences* to be drawn from the evidence. *Blue*, 189 Ill. 2d at 127. As discussed above, "[t]he very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill." *Mitchell*, 209 Ill. App. 3d at 569. In this case, the prosecutor was making a reasonable inference from the evidence that Mr. Dragan's actions in shooting at the troopers demonstrated his intent to kill. Such a statement was within the bounds of reasonable closing argument and did not even refer to the State's burden. *People v. Phillips*, 392 Ill. App. 3d 243, 269 (2009). In fact, the prosecutor acknowledged during closing argument that the State had to prove the elements of the offense beyond a reasonable doubt.

¶ 43     Moreover, any alleged impropriety was cured where the trial court repeatedly reminded the jury that the State bore the burden of proving the essential elements of the charged offenses beyond

a reasonable doubt and specifically admonished the jury that closing arguments are not evidence. See *People v. Campbell*, 2012 IL App (1st) 101249, ¶ 42 (stating that a trial court may usually cure any prejudice arising from improper argument by promptly sustaining an objection to the challenged comment and giving a proper jury instruction). Here, before closing argument, the trial court instructed the jury:

> "What the lawyers say during the argument is not evidence and should not be considered by you as evidence. If a lawyer makes a statement that was not based on the evidence or reasonable inferences to be drawn from the evidence, you should disregard the statement."

The jury is presumed to follow instructions. *People v. Sutton*, 353 Ill. App. 3d 487, 501 (2004). Accordingly, because one could reasonably infer from the evidence presented that Mr. Dragan intended to kill the troopers when he shot at them, these remarks do not engender substantial prejudice and we find no error warranting plain error review. See *People v. Johnson*, 119 Ill. 2d 119, 143 (1987) ("[I]t is perfectly permissible for the prosecutor to state an opinion which is based on the record, or on a legitimate inference derived therefrom."). Because we find no error, there can be no plain error and we honor Mr. Dragan's forfeiture of this issue. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010) (citing *People v. Naylor*, 229 Ill. 2d 584, 593 (2008)).

¶ 44                                    C. Firearm Enhancement

¶ 45    Mr. Dragan next contends that the trial court erred in applying the 25-year firearm enhancement to his sentence because that enhancement does not apply to the offense of attempted murder of a peace officer. Mr. Dragan maintains that this argument is supported by the plain language of section 8-4(c)(1) of the Criminal Code of 2012 (720 ILCS 5/8-4(c)(1)(A), (D) (West 2018)).

¶ 46    Mr. Dragan acknowledges that he failed to preserve this error for appeal where he failed to make a contemporaneous objection and failed to raise the issue in a posttrial motion. He once again, contends, however, that we may review this error under the plain error doctrine because the right to be properly sentenced is a "substantial right." As noted, the first step of plain error review is to determine whether any error occurred, which requires a substantive review of the issue. *Walker*, 232 Ill. 2d at 124-25.

¶ 47    Section 8-4(c) provides for the sentencing of attempted murder and subsection (1) provides for various sentencing enhancements. In relevant part, section 8-4(c)(1) provides:

"A person convicted of attempt may be fined or imprisoned or both not to exceed the maximum provided for the offense attempted but, except for an attempt to commit the offense defined in Section 33A-2 of this Code:

(1) the sentence for attempt to commit first degree murder is the sentence for a Class X felony, except that

(A) an attempt to commit first degree murder when at least one of the aggravating factors specified in paragraphs (1), (2), and (12) of subsection (b) of Section 9-1 is present is a Class X felony for which the sentence shall be a term of imprisonment of not less than 20 years and not more than 80 years;

(B) an attempt to commit first degree murder while armed with a firearm is a Class X felony for which 15 years shall be added to the term of imprisonment imposed by the court;

(C) an attempt to commit first degree murder during which the person personally discharged a firearm is a Class X felony for which 20 years shall be added to the term of imprisonment imposed by the court;

(D) an attempt to commit first degree murder during which the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person is a Class X felony for which 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court; []" 720 ILCS 8-4(c)(1) (West 2018).

In turn, section 5/9-1(b)(1) as referred to in section 5/8-4(c)(1)(A) provides that:

"(b) Aggravating Factors. A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of first degree murder may be sentenced to death if:

(1) the murdered individual was a peace officer or fireman killed in the course of performing his official duties, to prevent the performance of his or her official duties, or in retaliation for performing his or her official duties, and the defendant knew or should have known that the murdered individual was a peace officer or fireman; or" 720 ILCS 5/9-1(b)(1) (West 2018).

¶ 48    In his opening brief, Mr. Dragan contended that there was a "split of authority" on the issue of whether the firearm enhancements in section 5/8-4(c)(1) apply to attempted murder of a peace officer. The question presented by these cases was whether the enhancements listed could apply "cumulatively"; that is, whether a defendant could receive an extended sentencing based on both

his attempted murder of a peace officer under section 8-4(c)(1)(A) and his use of a firearm under section 8-4(c)(1)(B)-(D). See, *e.g.*, *People v. Phagan*, 2019 IL App (1st) 153031. Both Mr. Dragan and the State agreed that the resolution of *People v. Taylor*, 2022 IL App (3d) 190281, which was then pending before the supreme court, would provide clarity on the issue and resolve the split in authority. While this case was pending, the supreme court issued its opinion in *People v. Taylor*, 2023 IL 128316 and we granted the State's motion to cite the ruling as additional authority. We find the supreme court's decision in *Taylor* controlling and dispositive of the issue before us.

¶ 49    In *Taylor*, the defendant was charged with, *inter alia*, attempted first degree murder of a peace officer in the course of performing his official duties. *Id.* ¶ 5. During the offense, the defendant fired a gun at the peace officer, but the peace officer was unharmed. *Id.* ¶ 4. After the jury found the defendant guilty, the trial court asked the parties whether the 20-year firearm sentencing enhancement in section 8-4(c)(1)(C) applied to the defendant's case, given that the defendant also was subject to the higher sentencing range for the attempted murder of a peace officer as set forth in section 8-4(c)(1)(A). *Id.* ¶¶ 10-11. The trial court found that the 20-year sentencing enhancement in section 8-4(c)(1)(A) did apply and sentenced the defendant to 30 years' imprisonment for the attempted murder of a peace officer in the course of performing his official duties, plus an additional 20 years for discharging a firearm in the attempted murder, for a total of 50 years' imprisonment. *Id.* ¶ 12. The appellate court affirmed the sentence over the defendant's objection to the alleged double enhancement. *Id.* ¶¶ 15, 18.

¶ 50    In addressing the defendant's contention, the supreme court noted the split of authority on this issue in the appellate court. *Id.* ¶¶ 46-54. Looking to the plain language of the statute, the supreme court agreed with the State that the firearm enhancements in subsections (B) through (D)

of section 8-4(c)(1) can apply to a sentence imposed under subsection (A). *Id.* ¶ 58. The court explained that:

"subsection (c)(1) and subsection (A) set forth baseline sentences for the offense of attempted first degree murder, *i.e.*, the 'term of imprisonment imposed by the court,' with subsection (A) imposing a longer baseline sentence based upon one of the aggravating factors specified in subsections (1), (2), and (12) of section 9-1(b). Subsections (B), (C), and (D) then provide that the firearm enhancements of 15, 20, or 25 years to natural life 'shall be added to the term of imprisonment imposed by the court.' " *Id.* ¶ 61.

The court found that there was no danger of impermissible double enhancement under this interpretation of the statute because a trial court could not simultaneously impose the 15-year, 20-year, and 25-year to natural life subsections. *Id.* ¶ 66. The supreme court therefore affirmed the defendant's sentence. *Id.* ¶ 70.

¶ 51 Here, like the defendant in *Taylor*, Mr. Dragan was sentenced pursuant to both subsection (A) and subsection (D) of section 8-4(c)(1). Mr. Dragan therefore was subject to a "longer baseline" sentence under subsection (A) and the firearm enhancement under subsection (D). Under *Taylor*, we find that this sentence was proper and was not an impermissible double enhancement. Because we find no error, there can be no plain error and we honor Mr. Dragan's forfeiture of this issue. *Hillier*, 237 Ill. 2d at 545.

¶ 52                                    D. One-Act, One-Crime

¶ 53 Mr. Dragan finally contends that his convictions for aggravated battery with a firearm and aggravated assault should be vacated under the one-act, one-crime rule. He maintains that his conviction for aggravated battery with a firearm was carved out of the same physical act as his

conviction for attempted murder. Similarly, he asserts that his conviction for aggravated assault was carved out of the same physical act as his conviction for aggravated unlawful restraint.

¶ 54    Mr. Dragan concedes that he failed to preserve this issue for appeal where he did not object at trial and did not raise the issue in a posttrial motion. He asserts, however, that we may review the issue as plain error. The supreme court has held that one-act, one-crime violations fall within the second prong of plain error as an obvious error so serious that it challenges the integrity of the judicial process. *People v. Coats*, 2018 IL 121926, ¶ 10. As with other claims of plain error, we must first determine whether a one-act, one-crime error occurred. *Id.* ¶ 11.

¶ 55    In *People v. King*, 66 Ill. 2d 551, 566 (1977), the supreme court held that a criminal defendant may not be convicted of multiple offenses when those offenses are all based on the same physical act. In determining whether the one-act, one-crime rule has been violated, we first determine whether the defendant's conduct consisted of a single physical act or separate acts. *Coats*, 2018 IL 121926, ¶ 12. If we determine that the defendant committed multiple acts, we next determine whether any of the offenses are lesser-included offenses. *Id.* If none of the offenses are lesser-included offenses, then multiple convictions are proper. *Id.* Whether the one-act, one-crime rule has been violated is a question of law, which we review *de novo*. *Id.*

¶ 56    Mr. Dragan first contends that his conviction for aggravated battery with a firearm should be vacated because it was carved out of the same physical act as his conviction for attempted murder and is a lesser-included offense of attempted murder. He maintains that both convictions are based on his single act of discharging his firearm a single time out of his basement window and striking Trooper Meyer.

¶ 57 The State concedes that Mr. Dragan's conviction for aggravated battery should be vacated under one-act, one-crime principles for the reasons Mr. Dragan states. We agree. The two relevant counts in the indictment charged Mr. Dragan with the same physical act. Therefore, the lesser felony, aggravated battery with a firearm, must be vacated. *People v. Mimes*, 2014 IL App (1st) 082747-B, ¶ 46; *People v. Aquino*, 239 Ill. App. 3d 12, 19 (1992). We therefore vacate Mr. Dragan's conviction for aggravated battery with a firearm and the corresponding 40-year concurrent sentence.

¶ 58 Mr. Dragan next contends that his conviction for aggravated assault of Trooper Manheim should be vacated where it was carved out of the same physical act as his conviction for aggravated unlawful restraint of Trooper Manheim. He maintains that both convictions were based on his single act of brandishing a gun while seated in the backseat of Trooper Manheim's squad car. The State disagrees, asserting that although both convictions were based on Mr. Dragan's brandishing the firearm, the conviction for aggravated unlawful restraint was also based on Mr. Dragan ordering Trooper Manheim to not leave the vehicle, which is not an element of aggravated assault. The State also contends that aggravated assault is not a lesser included offense of aggravated unlawful restraint.

¶ 59 "In determining whether the defendant's conduct constitutes a single physical act, courts consider: (1) the prosecutorial intent, as reflected in the language of the charging instrument; (2) the existence of an intervening act; (3) a time interval between successive parts of the defendant's conduct; (4) the similarity of the acts; and (5) the location of the acts." *People v. Murphy*, 261 Ill. App. 3d 1019, 1023 (1994) (citing *People v. Guzman*, 208 Ill. App. 3d 525, 535 (1990)). Here, Mr. Dragan was charged with the offense of aggravated unlawful restraint "in that he, knowingly

without legal authority detained Illinois State Police Trooper Eric Manheim, while using a deadly weapon, to wit: a firearm." Mr. Dragan was also charged with aggravated assault:

"in that he, without lawful authority, knowingly engaged in conduct which placed Illinois State Police Trooper Eric Manheim in reasonable apprehension of receiving a battery, and Volodymyr Dragan used a firearm, other than by discharging the firearm, against a peace officer, to wit: Volodymyr Dragan brandished a firearm and Trooper Manheim was assaulted to prevent performance of his official duties."

¶ 60    In support of his contention that his conviction for aggravated assault should be vacated, Mr. Dragan relies on *Murphy*, 261 Ill. App 3d 1019. In *Murphy*, the defendant was found guilty of, *inter alia*, aggravated unlawful restraint and aggravated assault. *Id.* at 1020. The facts underlying the defendant's convictions were that the defendant's ex-wife brought their children to the defendant's house for visitation. *Id.* The ex-wife stayed in her vehicle because she did not want to enter the defendant's house due to an order of protection. *Id.* at 1020-21. The defendant came out to the car carrying a loaded sawed-off shotgun. *Id.* at 1021. The defendant got into the front seat of the vehicle and pointed the shotgun at his ex-wife, which upset their older daughter. *Id.* The defendant allowed his ex-wife to bring their daughter into the front seat to comfort her and then told his ex-wife to drive to the park. *Id.* She complied and after she stopped the vehicle the defendant asked her personal questions and she agreed to attend counseling with him. *Id.* They then returned to the defendant's home where the defendant went inside and his ex-wife drove to the police station. *Id.*

¶ 61    On appeal, the defendant contended that his conviction for aggravated assault should be vacated under the one-act, one-crime rule because both his convictions for aggravated assault and

aggravated unlawful restraint were based on the same physical act: pointing a gun at his ex-wife which placed her in a reasonable apprehension of receiving a battery and coerced her to remain in the vehicle against her will. *Id.* at 1023-24. The State argued that there were two separate acts, the initial aggravated assault where the defendant pointed the shotgun at his ex-wife and then the aggravated unlawful restraint which took place after he permitted his ex-wife to comfort their child before ordering her to drive to the park. *Id.* at 1024. The court agreed with the defendant, finding that the aggravated unlawful restraint was a "continuing offense," which began when the defendant pointed the gun at his ex-wife, thereby preventing her from leaving the car. *Id.* The court therefore vacated the defendant's conviction for aggravated assault. *Id.*

¶ 62    Mr. Dragan asserts that the aggravated unlawful restraint here was likewise a "continuing offense" that began when he brandished a weapon, thereby preventing Trooper Manheim from leaving the vehicle. In this case, however, Trooper Manheim was not restrained only by Mr. Dragan's use of a weapon, but Mr. Dragan explicitly told Trooper Manheim to not exit the vehicle when he attempted to open the door. Indeed, Trooper Manheim attempted to open his door and Mr. Dragan told him not to move *before* Mr. Dragan displayed his weapon and racked a bullet into the chamber. "The key concern for unlawful restraint is whether a person was detained, that is, whether that person's 'freedom of locomotion was *** impaired.' [citation]. Neither physical force nor the presence of a weapon is required." *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 50. Therefore, because the aggravated unlawful restraint conviction required Mr. Dragan to impair Trooper Manheim's freedom of locomotion, an allegation that was not present in the charge for aggravated assault, the two offenses were not carved from precisely the same physical act. See *People v. Smith*, 2019 IL 123901, ¶ 23 (citing *People v. Dixon*, 91 Ill. 2d 346, 355 (1982) for the

proposition that "multiple acts may be found, as defined in *King*, even where the acts are interrelated."). In essence, aggravated assault is not "inherent" in aggravated unlawful restraint. *Id.* ¶ 34.

¶ 63    Additionally, aggravated assault is not a lesser-included offense of aggravated unlawful restraint. In determining whether an offense is a lesser-included offense, we apply the abstract elements approach, rather than looking to the charging instruments. *Coats*, 2018 IL 121926, ¶ 30. Under the abstract elements approach, we compare the statutory elements of the two offenses. *People v. Miller*, 238 Ill. 2d 161, 166 (2010). "If all of the elements of one offense are included within a second offense and the first offense contains no element not included in the second offense, the first offense is deemed a lesser-included offense of the second." *Id.* In that case, the less serious offense must be vacated. *Smith*, 2019 IL 123901, ¶ 37.

¶ 64    Under section 12-2 of the Criminal Code, a person commits the offense of aggravated assault when, in the course of committing an assault, he or she "[u]ses a firearm, other than by discharging the firearm, against a peace officer, community policing volunteer, fireman, private security officer, emergency management worker, emergency medical services personnel, employee of a police department, employee of a sheriff's department, or traffic control municipal employee" who is assaulted to prevent performance of his or her official duties. 720 ILCS 5/12-2(c)(6)(ii) (West 2018). As used in that section, "assault" means that person, without lawful authority, "knowingly engages in conduct which places another in reasonable apprehension of receiving a battery." 720 ILCS 5/12-1(a) (West 2018). Under section 10-3.1(a), a person commits the offense of aggravated unlawful restraint when he or she commits unlawful restraint while using a deadly weapon. 720 ILCS 5/10-3.1(a) (West 2018). A person commits the offense of "unlawful

restraint" when he or she "knowingly without legal authority detains another." 720 ILCS 5/10-3(a) (West 2018).

¶ 65    Therefore, not all of the elements of aggravated assault are included in the offense of aggravated unlawful restraint, and the offense of aggravated assault contains elements that are not included in aggravated unlawful restraint. Aggravated assault requires a person to use a firearm to put another person in reasonable apprehension of receiving a battery; aggravated unlawful restraint does not. Likewise, aggravated unlawful restraint requires the unlawful detention of another, whereas aggravated battery does not. Thus, under the abstract elements approach, aggravated assault is not a lesser-included offense of aggravated unlawful restraint. We therefore find no one-act, one-crime violation based on Mr. Dragan's convictions for aggravated assault and aggravated unlawful restraint.

¶ 66                            III. CONCLUSION

¶ 67    For the reasons stated, we vacate Mr. Dragan's conviction and sentence for aggravated battery, and we affirm the circuit court's judgment in all other respects.

¶ 68    Affirmed in part, and vacated in part.